*1167 HARTZ, Circuit Judge,
joined by HENRY and MURPHY, Circuit Judges, and joined in all but Part IV(B) by SEYMOUR, EBEL, BRISCOE, and LUCERO, Circuit Judges.
We have granted en banc review in this case to resolve difficult issues concerning intervention under Fed.R.Civ.P. 24. Several conservation groups — Southern Utah Wilderness Alliance, The Wilderness Society, and the Grand Canyon Trust (collectively, SUWA)—seek to intervene in a federal quiet-title action brought by San Juan County, Utah, against the United States, the Department of Interior, and the National Park Service (the NPS). (We will refer to the defendants collectively as the Federal Defendants.) The County sued to quiet title to the right-of-way it claims for Salt Creek Road, “an unpaved and ungraded jeep trail that runs in and out of Salt Creek” in Canyonlands National Park. 69 Fed.Reg. 32,871 (June 14, 2004). Opposed to County control of the road, SUWA applied to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2) and permissively under Fed.R.Civ.P. 24(b). The district court denied the applications, and SUWA appealed.
The original parties to the action, the County and the Federal Defendants (collectively the Appellees), filed briefs supporting the district court’s denial of intervention.[1] A divided panel of this court held that SUWA was entitled to intervene as a matter of right. See San Juan County v. United States, 420 F.3d 1197, 1201 (10th Cir.2005). Because the panel granted intervention as of right, it did not address permissive intervention. See id. at 1213-14. We now hold: (1) applicants for intervention need not establish standing, (2) sovereign immunity does not bar SUWA’s intervention, and (3) despite satisfying the other requirements for intervention under Rule 24(a), SUWA is not entitled to intervene as of right because it failed to overcome the presumption that its interest was adequately represented by the Federal Defendants. We also affirm the district court’s denial of SUWA’s application for permissive intervention under Rule 24(b).
I. BACKGROUND
A. R.S. 2477 Rights-of-Way
The underlying controversy is one of many throughout the West that concern an alleged right-of-way across federal land arising under Revised Statute 2477, enacted by Congress in 1866. R.S. 2477 provided for “right[s]-of-way for the construction of highways over public lands, not reserved for public uses.” An Act Granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for Other Purposes, Ch. CCLXII § 8, 14 Stat. 251, 253 (1866). This statute reflected a “congressional policy promoting] the development of the unreserved public lands and their passage into private productive hands,” S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 740 (10th Cir.2005), by making “a standing offer of a free right of way over the public domain,” id. at 741 (internal quotation marks omitted). See generally Harry R. *1168 Bader, Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis, 11 Pace Envtl. L.Rev. 485 (1994). “[A] right-of-way could be obtained without application to, or approval by, the federal government. Rather, the grant referred to in R.S. 2477 became effective upon the construction or establishing of highways, in accordance with the state laws.” Sierra Club v. Hodel, 848 F.2d 1068, 1078 (10th Cir.1988) (citations, brackets, and internal quotation marks omitted), overruled in part on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir.1992) (en banc).
R.S. 2477 was repealed by the Federal Land Policy and Management Act of 1976, Pub.L. No. 94-579, § 706(a), 90 Stat. 2743, 2793. But that Act “explicitly protect[ed] R.S. 2477 rights-of-way in existence” at the time of its enactment. Sierra Club, 848 F.2d at 1078. Because such a right-of-way could have come into existence without any judicial or other governmental declaration, much litigation continues over whether rights-of-way were in fact created on public land.
B. Earlier Litigation
San Juan County’s quest for title to Salt Creek Road stems from its dissatisfaction with restrictions on travel imposed while the road has been under federal control. In 1992 the NPS began preparation of a Backcountry Management Plan for Can-yonlands National Park. See S. Utah Wilderness Alliance v. Dabney, 7 F.Supp.2d 1205, 1207 (D.Utah 1998), rev’d, 222 F.3d 819 (10th Cir.2000). SUWA submitted comments and communicated with NPS personnel with the goal of closing Salt Creek Road to vehicular traffic. The final Backcountry Management Plan, published in January 1995, established a system of gates and permits to limit vehicular traffic, but it stopped short of closing the road. SUWA sued the NPS in federal court, challenging the plan. See id. at 1206, 1209. On June 19, 1998, the district court ruled that the NPS had violated the National Park Service Organic Act by permitting vehicular traffic in Salt Creek Canyon beyond Peekaboo Spring (also referred to as Peekaboo campsite). See id. at 1211. As a result of this decision, the Canyon was closed to vehicular traffic.
On August 15, 2000, we reversed the district court, holding that it had used an improper standard of review and remanding for further proceedings. See S. Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 822, 829 (10th Cir.2000). Shortly thereafter, on October 23, 2000, the NPS issued a temporary order closing Salt Creek Canyon above Peekaboo Spring to vehicular traffic while it engaged in formal rulemaking regarding use of the Canyon.
Two days later the County, asserting an R.S. 2477 right-of-way through Salt Creek Canyon, informed Canyonlands officials that NPS signs and gates near Salt Creek Road would be forcibly removed by County officials if the NPS did not remove them by December 1, 2000. A few days after the deadline, County officials removed the NPS signs and drove vehicles into the Canyon, allegedly with the NPS’s acquiescence.
SUWA, concerned about the potential environmental damage from these activities, moved to amend its complaint in the ongoing litigation to add the County and the State of Utah as defendants. The proposed amended complaint contended that “[t]he NPS ... has an obligation and duty to determine the validity of property claims adverse to the United States, and to require specifically that the State of Utah and San Juan County demonstrate the validity of its [sic] alleged right-of-way before making a decision or taking agency action allowing use of Salt Creek as a *1169 claimed ‘highway' right-of-way.” Aplee. (County) App. at 31. (SUWA named the State in addition to the County because it was an alleged co-owner of Salt Creek Road.) It also sought “an order enjoining San Juan County and the State of Utah from engaging in further activities for which no valid right-of-way has been established.” Id. The NPS, “while not agreeing with all of SUWA’s legal or factual allegations,” did not oppose SUWA’s motion to amend the complaint, agreeing that joinder of the County and the State “would enhance the prospects that issues pertinent to the questions of agency management of resources in Salt Creek Canyon ... [could] be resolved in an orderly way” and “would also give the court jurisdiction to ensure that San Juan County’s and the State’s actions pending final resolution of these issues do not limit the ability of the court to grant complete relief.” Order at 6, S. Utah Wilderness Alliance v. Nat’l Park Serv., No. 2:96CV559K (D.Utah Feb. 1, 2001).
The district court granted SUWA’s motion to amend on February 1, 2001, stating that addition of the County and the State was “necessary for the complete and just adjudication of this matter.” Id. In addition, the court, with the agreement of the NPS and SUWA, stayed proceedings on all issues — with the exception of whether an R.S. 2477 right-of-way existed — until the NPS’s rulemaking process was completed.
In August 2002 the County and the State separately moved for a partial summary judgment that they held a perfected R.S. 2477 right-of-way in the portion of Salt Creek Road above Peekaboo Spring. The NPS opposed the motions. It advanced several grounds, but the common essence of each ground was that the existence of the right-of-way would need to be determined in a suit under the Quiet Title Act and the County and the State had not filed such a suit (and had not satisfied certain jurisdictional prerequisites for a suit, such as providing 180 days’ notice to the appropriate federal agency). It said that the State and County could file a quiet-title suit by means of a cross-claim and even said, perhaps disingenuously, that it had anticipated that such a cross-claim would be filed. Two weeks later SUWA submitted a short memorandum containing a one-sentence adoption of the NPS’s argument and opposing the summary-judgment motions.
On January 15, 2003, the district court denied the motions for partial summary judgment. It was perplexed, and no doubt perturbed, by the position of the NPS and SUWA:
SUWA has sued the NPS for, among other things, an alleged obligation and duty to determine the validity of property claims adverse to the United States and to require specifically that the State and San Juan County demonstrate the validity of its alleged right-of-way before making a decision or taking agency action allowing use of Salt Creek Canyon as a claimed “highway” right-of-way. The State and County have asked for such a determination regarding their R.S. 2477 claims — a determination which SUWA has sued the NPS to obtain. Now, almost two years after the NPS supported SUWA’s request to name the State and the County as defendants in this action so that the R.S. 2477 issue could be resolved, the NPS and SUWA suddenly assert that the court has no jurisdiction to make such a determination. At the various status conferences that have been held in this case, no mention was ever made by the NPS or SUWA that they were expecting — or demanding — that cross-claims be filed by the State and County. Further, if a claim was necessary to resolve this is *1170 sue, it is unclear why the NPS itself has not asserted cross-claims against the State and County.
Aplt. Add. at 8-9 (Order, Jan. 15, 2003). Despite its displeasure with the NPS and SUWA, the court rejected the motions by the County and the State because the R.S. 2477 issue had not been raised in a proper quiet-title claim. Then, apparently acting sua sponte, the court dismissed the County and the State from the litigation, explaining:
[W]hile the NPS and SUWA have achieved their goal of convincing the court that it does not have jurisdiction to entertain motions for partial summary judgment, they have also compelled the dismissal of the State and County as defendants in this action because the State and County have been precluded from defending themselves in this lawsuit, as their only defense in this case is to seek an affirmative determination that they own a valid and perfected right-of-way. The court will not order the State and County — against their wishes — -to file suit against the United States, and the NPS has declined, for whatever reason, to file its own cross-claim against these entities. Because of the legal quagmire created by these unique circumstances and the fact that the State and County have been precluded from defending themselves, the court will not grant any relief against these defendants in this action. Thus, there is no reason for the State and County to be named as defendants in this action. This court never would have granted leave to amend SUWA’s complaint to add these defendants had the NPS and SUWA made clear to the court that the State and County would be required— against their wishes — to sue the NPS as a prerequisite to defending themselves. Thus, the only just result is to dismiss the State and County from this action.
Id. at 9-10.
C. This Litigation
On June 14, 2004, the NPS issued a final rule prohibiting motor vehicles in Salt Creek Canyon beyond Peekaboo Spring and erecting a gate to effect this closure. See 36 C.F.R. § 7.44 (2004). The notice accompanying the decision reflected the NPS’s conclusion that the County and the State held no R.S. 2477 right-of-way: “[I]t has not been shown that a valid right-of-way was constructed during the period when the lands were unreserved. Promulgation of this rule will not affect the ability of the County or State to pursue in an appropriate forum the claim that this is a valid R.S. 2477 right-of-way.” 69 Fed.Reg. at 32,872. Without waiting a day, the County filed this quiet-title action, naming the United States, the Department of Interior, and the NPS as defendants. The first cause of action in its amended complaint, filed on June 30, 2004, claims an R.S. 2477 right-of-way in Salt Creek Road. It alleges that the NPS’s “acts have wrongfully denied [the County] and the public the use of the Salt Creek road and disturbed [the County’s] quiet enjoyment of its R.S. 2477 right-of-way.” Aplt.App. at 17. The second cause of action seeks a declaration that a system of gates put in place by the NPS deprives the County of its use of the right-of-way for vehicular travel.
The County asserts that it acquired its right-of-way before the federal government reserved the land for Canyonlands National Park in 1962. See Nat’l Park Serv., Canyonlands Environmental Assessment Middle Salt Creek Canyon Access Plan, app. 4, at 159 (June 2002) (explaining that land for Canyonlands National Park was withdrawn on April 4, 1962, in anticipation of legislation to establish the Park). *1171 Its amended complaint details a series of alleged uses of the right-of-way from the 1890s through 1962, including construction and use of a road by a homesteader to access his homestead, construction and use of a road by a cattle company to trail cattle and haul supplies, use by hikers and explorers, use by persons in jeeps for commercial and sightseeing purposes, and use by oil and gas companies to access drilling locations. It claims that the right-of-way must be “sufficient in scope for vehicle travel as reasonable and necessary and according to the uses to which it was put prior to” April 1962. Aplt.App. at 16.
On July 6 and August 4, 2004, the groups comprising SUWA timely sought to intervene as a matter of right and permissively. The district court denied the applications on October 29, 2004, stating:
Well it seems to me that the pleadings define the case in a very narrow fashion and the existence or non-existence of a right-of-way and its length and its breadth are matters which it seems to me are fact driven and while I’m always interested in all the help that the court can get it would appear to me that the parties in this matter have a point.
I am going to deny the motion to intervene on the part of the petitioners, both the motion to intervene as a matter of right and the motion to intervene permissively and we’ll deny that in each instance. It appears to me that the parties may adequately present the necessary materials for an appropriate determination.
However if the prospective interve-nors wish to participate as amicus in the furnishing of material written in nature to the court I’m certainly happy to grant them status as amicus if they so desire in contrast to the status of a party, but I’ll leave that to the necessary requests in the event that people wish to participate in that fashion.
Id. at 198-99. SUWA appeals this ruling. We have jurisdiction under 28 U.S.C. § 1291.
II. STANDING TO INTERVENE
San Juan County first contends that SUWA cannot intervene under either Fed. R.Civ.P. 24(a) or (b) because it lacks Article III standing. Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies. U.S. Const. art. III, § 2. The Supreme Court has held that a suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing — namely, the plaintiff must (1) have suffered an injury in fact (2) that is fairly traceable to the defendant’s conduct and (3) that is likely to be redressed by a favorable decision. See Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).
Although it observed that “circuit courts addressing this issue have reached different results,” San Juan County, 420 F.3d at 1204, the panel opinion in this case concluded that “prospective intervenors need not establish their own standing to sue or defend, in addition to meeting Rule 24’s requirements, before intervening,” id. at 1203. The panel held that so long as there was Article III standing for the original party on the same side of the litigation as the intervenor, the intervenor need not itself establish standing. See id. at 1206. In support, it observed that “on many occasions the Supreme Court has noted that an intervenor may not have standing, but has not specifically resolved that issue, so long as another party to the litigation had sufficient standing to assert the claim at issue,” id. at 1205 (citing McConnell v. Fed. Election Comm’n, 540 U.S. 93, 233, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); Arizonans for Official English v. Arizona, *1172 520 U.S. 43, 66, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); and Diamond v. Charles, 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)). This failure to resolve the intervenor’s standing was significant because the Court could not simply ignore whether the requirements of Article III had been satisfied. “[Standing implicates a court’s jurisdiction, [and] requires a court itself to raise and address standing before reaching the merits of the case before it.” Id. The panel recognized, however, that “if the original party on whose side a party intervened drops out of the litigation, the intervenor will then have to establish its own standing to continue pursuing litigation.” See id. at 1205 n. 3.
On rehearing en banc we adopt the panel’s reasoning on this issue and hold that parties seeking to intervene under Rule 24(a) or (b) need not establish Article III standing “so long as another party with constitutional standing on the same side as the intervenor remains in the case.” Id. at 1206. In that circumstance the federal court has a Case or Controversy before it regardless of the standing of the interve-nor.
III. SOVEREIGN IMMUNITY
A. Description of the Sovereign-Immunity Claim
Before we turn, to the application of Fed.R.Civ.P. 24 to this ease, we must first determine whether granting SUWA intervention under this rule would infringe upon sovereign immunity in litigation under the Quiet Title Act, 28 U.S.C. § 2409a, enacted in 1972. The Federal Rules, of course, ordinarily govern proceedings in federal court. See Fed.R.Civ.P. 1. Under the Rules Enabling Act, “The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals,” 28 U.S.C. § 2072(a), and “[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect,” id. § 2072(b). On the other hand, “[s]uch rules shall not abridge, enlarge or modify any substantive right,” id.; and Fed. R.Civ.P. 82 states that the rules “shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein.”
Judge McConnell’s concurrence (the “SI concurrence”) contends that intervention by SUWA under Rule 24 would improperly expand the district court’s jurisdiction because it would abridge sovereign immunity. The SI concurrence’s sovereign-immunity argument goes far beyond anything presented to this court by the Appellees, who mention sovereign immunity almost in passing with essentially no citation to authority that would clarify the scope of what is being asserted. But questions regarding our jurisdiction must be addressed, so we proceed despite the absence of helpful briefing.
The SI concurrence’s concern about adding SUWA as a defendant is not that the Quiet Title Act bars the addition of all defendants other than the United States. The Act undoubtedly contemplates that the plaintiff can seek to clear title by naming as defendants anyone in addition to the United States who may claim an interest in the property. The statute says that “[t]he United States may be named as a [not the ] party defendant in a civil action under this section to adjudicate a disputed title .... ” § 2409a(a) (emphasis added). And joining other defendants is hardly unheard of. See Amoco Prod. Co. v. United States, 619 F.2d 1383 (10th Cir.1980); Bily v. Ill. Cent. Gulf R.R., 637 F.Supp. 127 (N.D.Ill.1986) (court initially had jurisdiction under Quiet Title Act but dismissed *1173 case after government disclaimed -interest because court thereby was deprived of jurisdiction under what is now § 2409a(e)). Moreover, although an additional defendant’s interest may well be adverse to the United States, it also may be consistent with the United States’ claim if it arises in the same chain of title. Because the United States thus may have a codefendant advocating the United States’ title, the SI concurrence’s concern also is not simply the addition of a codefendant who may raise arguments in support of that claim of title.
Accordingly, the peculiar sovereign-immunity contention in this case must be the following: Sovereign immunity bars the addition in a quiet-title suit against the United States of a codefendant who claims no interest in the property and supports the United States’ claim of title, even though (1) the Quiet Title Act allows the addition of codefendants of the United States, (2) such a codefendant may be a vigorous advocate of the United States’ title, and (3) the added party would raise no new claim against the United States but would address only a claim on which the United States has consented to be sued.[2] Furthermore (continuing with the contention), even though no language in the Quiet Title Act bars intervention on the side of the United States, freedom from such intervention is such a fundamental attribute of sovereignty that it must be recognized because it is not expressly waived in the Act.
We find this to be a remarkable proposition. Consider the limited nature of what is at stake. The SI concurrence speaks of the burden that may be imposed on the United States by an intervenor who can “raise new issues, oppose settlements, appeal, and file petitions for certiorari.” SI concurrence at 1210. We address each alleged burden. First, SUWA could not block a settlement. See Local No. 93, Int’l Ass’n of Firefighters v. City of Cleveland, 478 U.S. 501, 528-29, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (“It has never been supposed that one party — whether an original party, a party that was joined later, or an intervenor — could preclude other parties from settling their own disputes and thereby withdrawing from litigation.”); Johnson v. Lodge # 93 of the Fraternal Order of Police, 393 F.3d 1096, 1106 (10th Cir.2004). And to the extent that an inter-venor can present arguments against settlement to which the government must respond, so can an amicus. See United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 992-93 (2d Cir.1984) (Friendly, J.); Latin Am. Law Enforcement Ass’n v. City of LA, 29 F.3d 633, 1994 WL 383884, *3 (9th Cir.1994) (unpublished table decision); In re Telectronics Pacing Sys., Inc., 137 F.Supp.2d 985, 1021-24 (S.D.Ohio 2001); Brooks v. State Bd. of Elections, 848 F.Supp. 1548, 1556 (S.D.Ga.1994).
Second, there is no need to resolve at this stage of this case whether SUWA could appeal or seek certiorari when the government does not wish to. We fail to understand the SI concurrence’s statement that “[o]nce SUWA is granted party status at the trial level — in other words, once we hold that the Quiet Title Act permits such participation- — -it would make little sense to hold that the Act precludes such a party’s participation at the appellate level.” SI concurrence at 1219-20. In our view, such a limitation on appeal could make perfect *1174 sense. After all, an intervenor who lacks standing cannot pursue an appeal if the original parties choose not to. See discussion, supra, at 1171-72; see also Korczak v. Sedeman, 427 F.3d 419 (7th Cir.2005) (intervenor not permitted to appeal).
The remaining “burden” that an interve-nor could impose on the United States in district court would be raising new issues. But the Quiet Title Act’s waiver of sovereign immunity to permit suits “to adjudicate a disputed title to real property in which the United States claims an interest,” 28 U.S.C. § 2409a, inherently encompasses exposure to the risk of having to address every relevant legal theory. Indeed, the court trying the case (even in the absence of any intervenor) can require the government to address a legal theory not raised by the original parties. See Dickerson v. United States, 530 U.S. 428, 441 n. 7, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). (Moreover, on its own authority the court can call and question witnesses. See Fed. R.Evid. 614; 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 6234, at 18 (1997) (Rule 614(a) promotes “accurate factfinding” and “gives courts broad discretion to exercise its power to call witnesses in a wide range of circumstances”).) In short, the Quiet Title Act has waived sovereign-immunity objections to these burdens by permitting the County’s suit against the United States in the first place.
In other words, the intervention of SUWA would not expose the United States to any burden not inherent in the litigation to which it has consented in the Quiet Title Act. The lawsuit would still concern only the relative rights of the County, the State, and the United States in Salt Creek Road. SUWA would not be adding a new claim; it seeks no coercive judicial remedy against the United States. And every issue, every legal argument, every item of evidence that SUWA might present is one that another party or the court would undoubtedly have the right to present in the absence of SUWA. SUWA may in fact present matters that would not have been presented by other parties or the court, but, from the point of view of the government’s waiver of sovereign immunity, that is a mere fortuity; nothing raised by SUWA would be an expansion of what the government potentially faced at the initiation of the lawsuit. We now discuss whether intervention would nevertheless infringe upon the government’s sovereign immunity.
B. Framework of the Analysis
The SI concurrence cites a number of opinions that purportedly support a sovereign-immunity claim in this case. To analyze those cases properly, we must first distinguish two concepts: (1) sovereign immunity and (2) a condition on a waiver of sovereign immunity. As we shall explain, protection from intervention by an aligned party is neither “an aspect of the government’s immunity,” SI concurrence at 1212, nor a condition on the waiver of sovereign immunity in the Quiet Title Act, see id. at 1212 (referring to “terms of the immunity waiver” of the Quiet Title Act); cf. id. at 1215 (referring to limitations in Quiet Title Act regarding pleading requirements). But treating the two concepts separately will clarify the analysis.
As stated by Alexander Hamilton in The Federalist, “It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual, without its consent.” The Federalist No. 81, at 446 (E.H. Scott ed., 1898). Sovereign immunity is immunity from suit. See Black’s Law Dictionary 766 (8th Ed.2004) (Defining sovereign immunity as “1. A government’s immunity from being sued in its own *1175 courts without its consent.... 2. A state’s immunity from being sued in federal court by the state’s own citizens.”). Absent a waiver of sovereign immunity — that is, consent by the government to be sued — a court cannot make a government pay its debts or compensate for its torts, or impose other coercive remedies on the government. In contrast, when a court proceeding cannot result in the imposition of a coercive sanction against the government, the proceeding does not infringe upon sovereign immunity. Thus, in Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004), the Supreme Court discerned no infringement of state sovereignty arising from an adversary proceeding in bankruptcy court to determine whether to discharge a Chapter 7 debtor’s student loan that was guaranteed by a state entity. The impact on the State of a discharge was obvious (as the guarantor, it would have to pay) and the State would surely wish to participate in the adversary proceeding; but the debtor did “not seek monetary damages or any affirmative relief from a State ... nor d[id] he subject an unwilling State to a coercive judicial process.” Id. at 450, 124 S.Ct. 1905. Examples of infringements of sovereign immunity for which there must be a waiver include judgments for money, such as imposition of state civil fines against the United States, see U.S. Dep’t of Energy v. Ohio, 503 U.S. 607, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992) (no waiver of sovereign immunity from state civil fines); an award of interest on attorney fees, see Library of Congress v. Shaw, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (no waiver of sovereign immunity from award of interest on attorney fees); and liability for tort claims, see Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972) (no waiver of sovereign immunity from strict or absolute liability for ultrahazardous activity).
Sovereign immunity is to be contrasted with the imposition of conditions on the waiver of that immunity. When the government consents to be sued, it can impose conditions on that consent. See Block v. North Dakota, 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); Lehman v. Nakshian, 453 U.S. 156, 161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). It can require notice of suit, set a statute of limitations, forbid discovery from the government, or even forbid joinder of parties, to name just a few possibilities. The government does not consent to be sued when such a condition is not met, so sovereign immunity generally requires dismissal of the suit if the plaintiff does not satisfy all conditions imposed by the government. See Block, 461 U.S. at 287, 103 S.Ct. 1811.
The Quiet Title Act waives the government’s immunity from suits to determine title to property in which the plaintiff and the United States both claim an interest. The proper approach in this case would seem to be to analyze whether this waiver is conditioned on a ban on the intervention of parties aligned with the United States who raise no independent claim for relief. We will present that analysis later in this opinion. But the SI concurrence makes an additional argument. We read the SI concurrence as saying that protection from such intervention is not just a condition on the waiver of immunity but is an essential aspect of sovereign immunity that must be explicitly waived by the government. We find no support for that view and strong indications to the contrary in Supreme Court precedent. We proceed to explain.
C. Alleged Restriction on Intervention as Component of Sovereign Immunity
The SI concurrence relies on two Supreme Court opinions for the proposition *1176 that joinder of a party, even one aligned with the government who makes no claim against the government, infringes upon sovereign immunity. Neither opinion says any such thing.
The principal opinion relied upon, United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), offers no support to the SI concurrence’s position. The SI concurrence asserts that “[t]he sole issue in Shemood was joinder of necessary parties.” SI concurrence at 1214 n. 5. Yet it was the presentation of a new claim to the tribunal that Sherwood was about. A careful reading of Sherwood shows that the Supreme Court’s holding was simply that the district court lacked jurisdiction to hear a suit between two private parties, and since victory in that suit was a necessary condition for the plaintiff to bring his suit against the government, that suit could not proceed.
Sherwood was a suit under the Tucker Act, which gave Article III district courts concurrent jurisdiction with the Court of Claims (established under Article I of the Constitution, see 312 U.S. at 587, 61 S.Ct. 767) to hear breach-of-contract and other claims against the United States of up to $10,000. Sherwood had obtained a judgment against Kaiser in New York state court for $5,567.22. The state court also entered an order authorizing Sherwood to sue under the Tucker Act to recover damages from the United States for breach of its contract with Kaiser. See id. at 585, 61 S.Ct. 767. Sherwood would be entitled to retain out of any recovery in that suit “a sum sufficient to satisfy his judgment with interest” and costs. Id. at 586, 61 S.Ct. 767. Sherwood then sued the United States and Kaiser in federal district court, claiming that Kaiser’s damages were $14,448.49 and praying for judgment in the amount of $10,000. Kaiser had to be named as a party because of the need to determine (1) Sherwood’s rights, as against Kaiser, to maintain the suit; (2) what rights Kaiser might have to any damages above $10,000; and (3) the apportionment between Sherwood and Kaiser of any recovery in the suit. See id. at 591, 61 S.Ct. 767. These were all issues quite different from the validity of the claim against the United States. The district court held that it lacked jurisdiction, the Second Circuit reversed, and the Supreme Court reversed the circuit court.
The Court observed that the suit could not have been maintained in the Court of Claims “because that court is without jurisdiction of any suit brought against private parties and because adjudication of the right or capacity of [Sherwood] to proceed with the suit upon the contract of [Kaiser] with the United States is prerequisite to any recovery upon the Government contract.” Id. at 588, 61 S.Ct. 767. It noted that in any suit by Sherwood under the state-court order (which authorized Sherwood to pursue Kaiser’s claim against the government), Kaiser would have the right “to attack the validity of the order and of the judgment on which it is founded.” Id. at 588-89, 61 S.Ct. 767. In other words, the Court of Claims had no jurisdiction to hear Sherwood’s claim that he had the right to bring Kaiser’s claim against the United States; and because resolution of the Kaiser-Sherwood controversy was necessary before Sherwood could proceed against the United States, the Court of Claims had no jurisdiction to hear the case.
The Supreme Court then raised the possibility that under the Tucker Act or by virtue of the rules of procedure the district court may have jurisdiction not granted the Court of Claims. See id. at 589, 61 S.Ct. 767. It rejected that possibility. It began by stating that the rules of procedure cannot enlarge a court’s jurisdiction. *1177 See id. at 589-90, 61 S.Ct. 767. Therefore, the dispositive issue was whether the Tucker Act itself gave district courts greater jurisdiction than the Court of Claims. The Court held that it did not, explaining the complexities that would result from giving the district court, whose jurisdictional limit (unlike the Court of Claims) was $10,000, jurisdiction to hear a claim that could not be heard by the Court of Claims. It wrote:
The present litigation well illustrates the embarrassments which would attend the defense of suits brought against the Government if the jurisdiction of district courts were not deemed to be as restricted as is that of the Court of Claims. The Government, to protect its interests, must not only litigate the claim upon which it has consented to be sued, but must make certain that respondent’s right, as against the judgment debtor, to maintain the suit is properly adjudicated. And since the alleged claim for damages is larger than the $10,000 jurisdictional amount the Government must either be subjected to successive suits for partial recoveries of the amount due or must make certain that respondent has legal authority to relinquish the judgment debtor’s claim in excess of $10,000, and that this has been accomplished by the limitation of his demand for judgment to that amount.
Id. at 591, 61 S.Ct. 767 (emphasis added). If Sherwood’s suit could be heard in district court, the government would be concerned with the litigation of a variety of issues totally distinct from those raised by the contract claim on which it had waived immunity and, because the district court’s jurisdictional limit was $10,000, could be subjected to multiple lawsuits.
To repeat, all that Sherwood held was that Sherwood’s claim against Kaiser (which was a predicate for Sherwood’s claim against the United States) was beyond the jurisdiction of the Court of Claims and therefore beyond the jurisdiction of the district court, whose Tucker Act jurisdiction was limited to claims within the Court of Claims’ jurisdiction.
The SI concurrence relies on the following passage:
Th[e incorrect] conclusion [of the lower court] presupposes that the United States, either by the rules of practice or by the Tucker Act or both, has given its consent to be sued in litigations in which issues between the plaintiff and third persons are to be adjudicated. But we think that nothing in the new rules of civil practice so far as they may be applicable in suits brought in district courts under the Tucker Act authorizes the maintenance of any suit against the United States to which it has not otherwise consented. An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction; and the Act ... authorizing this Court to prescribe rules of procedure in civil actions gave it no authority to modify, abridge or enlarge the substantive rights of litigants or to enlarge or diminish the jurisdiction of federal courts.
312 U.S. at 589-90, 61 S.Ct. 767. But the passage expresses nothing more than the unremarkable proposition that if the district court otherwise lacked jurisdiction to hear Sherwood’s claim against Kaiser, the rules of procedure could not confer such jurisdiction.
It is worth noting the role of sovereign immunity in Sherwood. The Court said that a sovereign can impose conditions on its consent to be sued. See id. at 587, 61 S.Ct. 767. One condition in the Tucker Act was that the district court’s jurisdiction was to be no greater than that of the *1178 Court of Claims, so if the Court of Claims could not hear a claim, neither could the district court. See id. at 590-91, 61 S.Ct. 767. Because the Court of Claims could not hear Sherwood’s claim against Kaiser, see id. at 588-89, 61 S.Ct. 767, the district court also lacked jurisdiction to hear it. Sherwood does not stand for the proposition that sovereign immunity itself always prohibits the joinder of other claims with a claim for which sovereign immunity has been waived, and says absolutely nothing about joinder of an intervenor who brings no new claims to the litigation.
Sherwood has been cited often enough, and it has been the subject of scholarly treatment, much of it critical, see, e.g., 1 William W. Barron, Alexander Holtzoff & Charles Alan Wright, Federal Practice and Procedure, § 127, at 561-63 (1960); 3A James Wm. Moore, Moore’s Federal Practice, ¶ 20.07(3), at 20-55 to 20-58 (2d ed.1987), and suggesting that it be construed narrowly, see 4 Charles Alan Wright & Arthur R. Miller, supra, § 1027, at 131 (limiting Sherwood to the Tucker Act because of the peculiar nature of the concurrent jurisdiction of the Court of Claims); 17 id. § 4101 n. 28, at 262 (describing holding as: “if [a suit’s] maintenance against private parties is a prerequisite to prosecution of the action against the United States, the action must be dismissed”). But it has not been interpreted as standing for the broad proposition asserted by the SI concurrence.
The other opinion relied upon by the SI concurrence is Henderson v. United States, 517 U.S. 654, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996). But Henderson addresses only whether a Federal Rule of Civil Procedure could override an explicit condition imposed by a statute waiving sovereign immunity. It says nothing about what is inherent in sovereign immunity.
Henderson filed suit against the United States under the former Suits in Admiralty Act, 46 U.S.C.App. § 741 et seq., repealed Pub.L. No. 109-304, § 19, 120 Stat. 1710 (2006). The statute required that service be made “forthwith.” Id. § 742. Fed.R.Civ.P. 4, however, allows 120 days for service. The Court wrote: “We are ... satisfied that Rule 4’s regime conflicts irreconcilably with Suits in Admiralty Act § 2’s service ‘forthwith’ instruction, and we turn to the dispositive question: Does the Rule supersede the inconsistent statutory direction?” 517 U.S. at 663, 116 S.Ct. 1638. The Court said that the answer to the question turned on whether the forthwith requirement was substantive or jurisdictional, citing 28 U.S.C. § 2072(a) (federal rules of procedure cannot modify substantive rights), and Fed.R.Civ.P. 82 (rules cannot extend or limit jurisdiction). See id. at 663-64, 116 S.Ct. 1638. The Court held that it was neither. It explained: “Service of process, we have come to understand, is properly regarded as a matter discrete from a court’s jurisdiction to adjudicate a controversy [1] of a particular kind,19 or [2] against a particular individual or entity.20” Henderson, 517 U.S. at 671, 116 S.Ct. 1638(Footnote 19 described [1] as subject-matter jurisdiction, see id. n. 19, and footnote 20 described [2] as jurisdiction over persons, see id. n. 20.) “Its essential purpose,” continued the Court, “is auxiliary, a purpose distinct from the substantive matters aired in the precedent on which the dissent, wrenching cases from context, extensively relies — who may sue, on what claims, for what relief, within what limitations period.” Id. (footnotes omitted).
The SI concurrence contends that Henderson identified “the ‘substantive’ core of sovereign immunity,” which is not “governed by ... generally applicable provisions of the Rules of Civil Procedure.” *1179 SI concurrence at 1213. But Henderson hardly supports the SI concurrence’s theory that protection against intervention by a party who raises no claim is an inherent component of sovereign immunity. Henderson does not address such intervention, and the SI concurrence misconceives Henderson's, use of the term substantive.
The language on which the SI concurrence rests is the Court’s statement that “who may sue” is a “substantive matter[ ].” But “who may sue” refers to who may bring a suit, not who can intervene in an ongoing suit (especially when the interve-nor adds no new claim). The case cited by the Court as illustrating “who may sue” was Sherwood. The Court described Sherwood’s holding in the following parenthetical: “Tucker Act, allowing contract claims against United States, does not authorize joinder of claims between private parties.” Id. at 671 n. 21, 116 S.Ct. 1638. This description of Sherwood, which focuses on “joinder of claims,” certainly implies that the Court was equating “who may sue” with “who may bring a claim.” There is certainly nothing to suggest that the Court meant “who may sue” to encompass “who may intervene in an ongoing action without introducing a new claim.” To reach that interpretation of the Court’s language and citation to Sherwood would require “wrenching cases from context.” Id. at 671, 116 S.Ct. 1638.
Moreover, and perhaps more importantly, even if protection from intervention were considered a “substantive matter,” it does not follow that it is an inherent component of sovereign immunity. The Court in Henderson distinguished jurisdictional matters — namely, subject-matter and personal jurisdiction' — and substantive matters. 517 U.S. at 671, 116 S.Ct. 1638. It devoted one sentence to the proposition that service of process is not jurisdictional, see id. (“Service of process, we have come to understand, is properly regarded as a matter discrete from a court’s jurisdiction to adjudicate a controversy of a particular kind, or against a particular individual or entity.” (footnotes omitted)), and devoted the next sentence to the proposition that service of process is not a substantive matter, see id. (“Its essential purpose is auxiliary, a purpose distinct from the substantive matters aired in the precedent on which the dissent ... relies — who may sue, on what claims, for what relief, within what limitations period.” (footnotes omitted)). The dichotomy follows from the two sources of restrictions on application of the Federal Rules. The Rules Enabling Act, which authorizes “general rules of practice and procedure,” forbids rules that “abridge, enlarge or modify any substantive right.” 28 U.S.C. § 2072(a) (emphasis added). Fed.R.Civ.P. 82 states that the rules “shall not be construed to extend or limit the jurisdiction of the United States district courts.” (emphasis added). Thus, when Henderson lists various substantive matters, it is not asserting that they are jurisdictional (although they may be), much less that they are inherent in sovereign immunity (which, to be sure, is a jurisdictional matter). For example, Henderson lists the “limitations period” as a substantive matter, even though the Court has referred to a statute of limitations as a “condition to the waiver of sovereign immunity,” Irwin v. Department of Veterans Affairs, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (emphasis added), rather than as an inherent aspect of such immunity.[3]
*1180 Perhaps the SI concurrence is raising an argument never raised by the parties: that intervention is a matter of substance and therefore is not a proper subject of the Federal Rules of Civil Procedure. Given the longevity of Rule 24, this would be a remarkable proposition. Also, we note that in permitting a union member to intervene on the side of the government, the Supreme Court referred to “the procedural device of intervention.” Trbovich v. United Mine Workers of America, 404 U.S. 528, 536 n. 7, 92 S.Ct. 630, 30 L.Ed.2d 686 (emphasis added). Because it is not a matter of jurisdiction, we need not address this unraised issue further.
Thus, there is no authority for the assertion by the SI concurrence that in a suit against the government the mere addition of a party (even one who brings no claim) infringes upon sovereign immunity. Indeed, although presented with clear opportunity to do so, the Supreme Court has not even said that joinder of a claim against a private party to a claim against the United States infringes upon inherent sovereign immunity (as opposed to being a violation of a condition on a waiver of sovereign immunity, as in Sherwood).
That opportunity arose in Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which makes nary a mention of Sherwood’s alleged holding that sovereign immunity precludes the addition of a private defendant in a suit against the United States. Barbara Finley’s husband and two of her children were killed when their plane struck electric transmission lines. She sued the United States under the Federal Tort Claims Act (FTCA) and attempted to join claims against nonfederal defendants. The FTCA waives sovereign immunity by granting district courts “jurisdiction of civil actions on claims against the United States” for certain torts by government employees. 28 U.S.C. § 1346(b)(1). The United States contended that the court lacked jurisdiction over the claims against other parties, arguing three points. First, it stated that “ ‘the most natural reading— perhaps the only natural reading' — of [the statutory] language is that it extends only to the adjudication of claims against the United States and not against other persons.’ ” David L. Shapiro, Supplemental Jurisdiction: A Confession, an Avoidance, and a Proposal, 74 Ind. L.J. 211, 213 (1998) (quoting United States Brief at 17) (brackets in article omitted). Second, it made a policy argument that the private claim could be tried to a jury (whereas an FTCA claim is heard by a judge) and “confusion ... would be caused by the significant differences between the criteria governing the liability of the United States and the criteria governing the liability of private entities.” Id. Third, it turned to Sherwood, noting that a private party could not be joined as a codefendant in a Tucker Act case and that a House Report on the FTCA, citing Sherwood, had said that the proposed FTCA would not allow joinder of a defendant with the United States. See id. at 214. (Undoubtedly, the government was referring to joinder of an additional claim against the private defendant.)
The Supreme Court rejected jurisdiction over the private claim. Although reaffirming precedents that recognized “ ‘pendent’ claim jurisdiction — that is, jurisdiction over nonfederal claims between parties litigating other matters properly before the court,” Finley, 490 U.S. at 548, 109 S.Ct. 2003, it held that bringing additional claims under pendent-party jurisdiction (“jurisdiction over parties not named in any claim that is independently cognizable *1181 by the federal court,” id. at 549, 109 S.Ct. 2003) is impermissible absent statutory authority except in a limited class of ancillary-jurisdiction cases, see id. at 551-56, 109 S.Ct. 2003. It decided that the FTCA gave no such statutory authority,- writing:
The FTCA, § 1346(b), confers jurisdiction over “civil actions on claims against the United States.” It does not say “civil actions on claims that include requested relief against the United States,” nor “civil actions in which there is a claim against the United States”— formulations one might expect if the presence of a claim against the United States constituted merely a' minimum jurisdictional requirement, rather than a definition of the permissible scope of FTCA actions.... [W]e conclude that “against the United States” means against the United States and no one else.... The statute here defines jurisdiction in a manner that does not reach defendants other than the United States.
Id. at 552-53, 109 S.Ct. 2003. The Court concluded: “All our cases ... have held that a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties. Our decision today reaffirms that interpretative rule....” Id. at 556, 109 S.Ct. 2003.
Interestingly, Finley made only one reference to Sherwood:
“It is true that here ... the party seeking to bring the added claims had little choice but to be in federal rather than state court, since the FTCA permits the Federal Government to be sued only there. But that alone is not enough, since we have held that suits against the United States under the Tucker Act ... cannot include private defendants. United States v. Sherwood.”
Id. at 552, 109 S.Ct. 2003. Despite this undoubted familiarity with Sherwood, Finley never mentions “sovereign immunity.” The natural inference is that the Supreme Court did not read Sherwood as saying, or otherwise understand the doctrine of sovereign immunity to say, that the mere joinder of a claim between two other parties to a claim against the United States implicates sovereign immunity. This inference gains further strength from the Supreme Court’s response to the congressional reaction to Finley.
That reaction to Finley was, as they say, swift and sure. The Judicial Improvements Act was enacted 18 months later. The provision pertinent to this case states:

Supplemental Jurisdiction

(a)Except as provided in subsections (b) [relating to diversity jurisdiction] and (c) [granting district courts discretion to decline supplemental jurisdiction in certain circumstances] or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under. Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.
28 U.S.C. § 1367(a) (emphasis added).
Section 1367(a) is expressed in general terms, applying to all litigants. There is no mention of sovereign immunity or of the special status of the government as a litigant. Under settled law, as recognized in the SI concurrence, this statute does not waive federal sovereign immunity. See, e.g., Lane v. Pena, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (“A waiver of the Federal Government’s sovereign immunity must be unequivocally ex *1182 pressed in statutory text and will not be implied.” (citation omitted)).[4] Thus, in the SI concurrence’s view of sovereign immunity, § 1367 would not change the result in Finley. Sovereign immunity would still be infringed by the addition of a new defendant in an FTCA suit against the United States. Section 1367 would only have overturned the holding of Finley or the rationale of its result. Yet the Supreme Court stated in Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005), that “ § 1367 overturned the result in Finley,” id. at 558, 109 S.Ct. 2003 (emphasis added). The Court’s choice of the word result is hardly dispositive; but it is another good indicator that the Court does not view the mere addition of a party as an infringement of sovereign immunity.[5]
The SI concurrence declares that our reference to Finley, and its aftermath in the enactment of § 1367 and the dictum in Allapattah, “is an extraordinarily slender *1183 reed” to rely on. SI concurrence at 1214 n. 4. But, of course, our purpose in discussing these cases is not so much to prove our point as to demonstrate the absence of support for the SI concurrence’s position that sovereign immunity bars any addition of a party in a suit against the sovereign. As we have seen, the only support for the SI concurrence’s conclusion is a misinterpretation of Sherwood. If that interpretation had any traction, it is passing strange •that (1) the Finley Court did not accept the government’s invitation and mention, at least in a footnote, this “fundamental” principle; (2) that Congress did not address sovereign immunity expressly in § 1367; and (3) that AUapattah stated that “§ 1367 overturned the result in Finley,” 545 U.S. at 558, 125 S.Ct. 2611. Quite simply, Sherwood, with all due respect, was the dog that did not bark.
Finally, as Judge Ebel states in his dissent, it makes no sense to say that sovereign immunity is infringed by participation on the side of the sovereign’s claim or defense. No one thought to suggest in Trbovich, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686, an opinion that will be addressed further in our discussion of Rule 24, that there is a sovereign interest that would be violated by allowing a union member to intervene on the side of the Secretary of Labor in challenging a union election. The Second Circuit observed more than 40 years ago that it could find no “support [for] the proposition that the United States must consent to be defended.” Int’l Mortgage & Inv. Corp. v. Von Clemm, 301 F.2d 857, 863-64 (2d Cir.1962); accord 7C Charles Alan Wright & Arthur R. Miller, supra, § 1917 at 483. We can repeat that statement today.[6]
In sum, ■SUWA’s intervention would not infringe upon the inherent sovereign immunity of the United States because SUWA raises no new claims against the government and does not seek damages or any coercive sanction against it.
D. Alleged Restriction on Intervention as Condition of Waiver of Sovereign Immunity
We now turn to what we believe is the proper question to be addressed: Does the Quiet Title Act condition its waiver of sovereign immunity on a prohibition against joinder of intervenors on the side of the United States who add no claims to the litigation? The clear answer is No.
The SI concurrence attempts to find support in the language of the Quiet Title Act for a prohibition on intervention. But the effort fails. The SI concurrence quotes § 2409a(a) of the Act, which states in pertinent part: “The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.....” As we have already noted, however, the statute says only that the United States may be a (not the) party defendant; it sets no restriction on what other parties may participate, and, as one might expect, courts have permitted other parties to participate, see discussion, supra, at 1172.
The SI concurrence also relies oh § 2409a(d), which states:
The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.
*1184 But this is merely a requirement for what the plaintiff must plead to initiate the federal-court proceeding. It modifies the customary pleading requirements for an initial complaint set forth in Fed.R.Civ.P. 8(a), but it says nothing about pleading or practice once the case is in court. Neither do the cases cited by the SI concurrence that hold that one with no claim to title cannot initiate an action under the Quiet Title Act. See SI concurrence at 1215. We fail to see even a hint in the Quiet Title Act that the government’s waiver of sovereign immunity is conditioned on a prohibition against joinder of parties aligned with the United States, either with or without their own claims to title, once suit has been properly initiated.
Moreover, such a condition would be anomalous in light of the origin of the Quiet Title Act. Before enactment of the Quiet Title Act the United States could bring quiet-title actions. It was just that persons with claims adverse to the United States could not. As summarized in Block v. North Dakota, 461 U.S. 273, 280-81, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983):
Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute — they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief. Also, since passage of the Tucker Act in 1887, those claimants willing to settle for monetary damages rather than title to the disputed land could sue in the Court of Claims and attempt to make out a constitutional claim for just compensation.
The Quiet Title Act resulted when “Congress sought to rectify this state of affairs.” Id. at 282, 103 S.Ct. 1811. In short, the Quiet Title Act provided for reciprocity. Rather than limiting quiet-title suits to those initiated by the government, private parties could now bring them against the government. The Act was intended to expand the access of private parties to quiet-title litigation with the United States.
Yet the SI concurrence would restrict access in one inexplicable respect. The concurrence concedes that in cases brought by the United States there is no sovereign-immunity concern with intervention on the side of the government. See SI concurrence at 1224. Why would Congress wish to forbid such intervention only when it is a private party, rather than the government, that initiates the litigation, even though the subject matter of the litigation (namely, who holds title) would be identical? We simply find it difficult to presume that the Quiet Title Act introduced a bar to intervention in support of the United States when such intervention would be possible if the United States had sued to quiet the same title.
In support of its strained construction of the Quiet Title Act, the SI concurrence invokes a perceived tradition of denying intervention to those without a claim to the property in litigation “between the United States and private parties over the ownership of property,” relegating such persons to amicus status. SI concurrence at 1216. The sole case law cited to demonstrate that tradition relates to the practice in century-old cases in which the courts never mentioned, much less ruled on, an attempt to intervene. (The SI concurrence also cites our recent decision in High Country Citizens Alliance v. Clarke, 454 F.3d 1177 (10th Cir.2006); but that case involved neither an intervenor nor an ami-cus. It merely cited the old cases for a different proposition — whether one without a claim to title could file suit.) Our research suggests that the tradition as *1185 serted by the SI concurrence somehow failed to catch hold in this part of the country. In Watt v. Western Nuclear, Inc., 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), a decision reversing this circuit, Western Nuclear had used gravel on its property to pave roads and sidewalks. The United States claimed that it owned the gravel. The Wyoming Stock Growers Association, which obviously was not claiming a right in the gravel on Western Nuclear’s land, intervened because of its concern that a decision against Western Nuclear could mean, as a matter of stare decisis, that its members could not use the gravel on their own lands. See id. at 41 n. 3, 103 S.Ct. 2218. In Pathfinder Mines Corp. v. Hodel, 811 F.2d 1288, 1290 (9th Cir.1987), a company challenged a federal-government decision that its mining claims were void. Two environmental organizations intervened on the government’s side. The SI concurrence correctly notes that we should not make too much of these cases because neither addressed the propriety of intervention. But, of course, neither did the old cases on which the SI concurrence relies. Our only point is that the “traditional model of litigation” hypothesized by the SI concurrence, SI concurrence at 1216, is a dubious invention.
We also reject the SI concurrence’s reb-anee on cases interpreting explicit conditions imposed in statutes waiving sovereign immunity. Cases construing such conditions (such as a statute of limitations that conditions waiver on the suits being brought within a specified time) are inapplicable because the Quiet Title Act contains no provision barring intervention of a party that makes no claim against the United States. Even if an explicit condition in the Act were entitled to strict construction, there is no condition to be strictly construed.
Moreover, to construe strictly some vague “sentiment” emanating from a statute to foreclose the applicability of a rule that generally applies in civil litigation would run counter to Supreme Court doctrine that takes a realistic, rather than a jaundiced, view of conditions on waivers of immunity. In recent years the Supreme Court has indicated that even when a statute waiving sovereign immunity imposes a categorical condition on that waiver (which has not happened in this case — the Quiet Title Act does not contain an explicit prohibition on intervention), the Court is likely to recognize exceptions to that condition that are recognized in private litigation, absent contrary indications in the statute. Irwin, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435, recognized equitable tolling of a bmitations period imposed as a condition of a waiver of sovereign immunity. Writing for the Court, Chief Justice Rehnquist acknowledged that “a condition to the waiver of sovereign immunity ... must be strictly construed,” id. at 94, 111 S.Ct. 453, and “[a] waiver of sovereign immunity cannot be impbed but must be unequivocally expressed,” id. at 95, 111 S.Ct. 453 (internal quotation marks omitted). Nevertheless, he said, “[o]nce Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver.” Id. He continued: “Such a principle is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation. We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.” Id. at 95-96, 111 S.Ct. 453.
Of course, a rebuttable presumption can be rebutted, as it was in the unanimous *1186 decisions in United States v. Beggerly, 524 U.S. 38, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998), and United States v. Brockamp, 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997). But the general proposition enunciated in Irwin is hardly in doubt. The Supreme Court followed Irwin in Scarborough v. Principi, 541 U.S. 401, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004). The Court considered the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), which permits an award of attorney fees to a prevailing party in litigation against the United States. The EAJA requires an application for fees to be filed within 30 days of the favorable judgment. It also requires the fee application to allege that the United States’ position in the litigation was not “ ‘substantially justified.’ ” Principi, 541 U.S. at 405, 124 S.Ct. 1856 (quoting 28 U.S.C. § 2412(d)(1)(A)). Although Scarborough had filed a timely fee application, the application omitted the not-substantially-justified allegation. He amended the application to include the necessary allegation, but not before expiration of the 30-day period to file the application. The Court held that the customary relation-back rules in ordinary civil litigation would apply and cure the defect in the original application. See id. at 418-19, 124 S.Ct. 1856. The Court rejected the Government’s argument “that § 2412’s waiver of sovereign immunity from liability for fees is conditioned on the fee applicant’s meticulous compliance with each and every requirement of § 2412(d)(1)(B) within 30 days of final judgment.” Id. at 419-20, 124 S.Ct. 1856. The Court relied on Irwin and its progeny for the proposition that “limitations principles should generally apply to the Government in the same way that they apply to private parties.” Id. at 421, 124 S.Ct. 1856 (internal quotation marks omitted).
The rationale of Irwin and Scarborough would seem to apply in general to procedural rules governing litigation. Application of those rules in litigation against the government “amounts to little, if any, broadening of the congressional waiver [of sovereign immunity]” and “is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation.” Irwin, 498 U.S. at 95-96, 111 S.Ct. 453. Indeed, even the two dissenters in Principi would apply Irwin broadly. Justice Thomas, joined by Justice Scalia, wrote: “[W]here the Government is made subject to suit to the same extent and in the same manner as private parties are, Irwin holds that the Government is subject to the rules that are applicable to private suits.” 541 U.S. at 426, 124 S.Ct. 1856 (internal quotation marks omitted). The dissent’s difference with the majority was its view that the predicate for the Irwin holding was absent in Scarborough. Justice Thomas said that “there is no analogue in private litigation for the EAJA fee awards at issue here [because] [s]ection 2412(d) authorizes fee awards against the Government when there is no basis for recovery under the rules for private litigation.” Id. at 427, 124 S.Ct. 1856 (citation and internal quotation marks omitted); see id. n. 5 (observing that § 2412(b) makes the United States “liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award,” whereas the provision at issue in the case, § 2412(d)(1)(A), adds a new ground for awarding attorney fees).
In our view, once a federal district court has jurisdiction of a case under the Quiet Title Act, the usual rules of procedure, which include Fed.R.Civ.P. 24, ordinarily apply. Indeed, as we noted earlier in this discussion of conditions on waiver, there is a significantly stronger case for applying the usual rules in this case than *1187 there was in Irwin and Scarborough. In those two cases the question was whether to recognize an exception to the specific requirement of a statute. Irwin recognized equitable tolling of the limitations period set forth in unqualified statutory language. Scarborough recognized relation back of an amendment adding an allegation that the statute directed to be included in the original EAJA application. Here, in contrast, there is no provision in the Quiet Title Act that explicitly prohibits intervention. We do not need to recognize, as in Irwin and Scarborough, an exception to a statutory mandate.
The SI concurrence, and we, have found only one Supreme Court opinion that imposes a condition on a waiver of sovereign immunity that is not explicitly stated in a statute. That opinion, however, relies' on a long and clear tradition and indicia in the. statute itself, and the condition is not contrary to the Rules of Civil Procedure. Lehman v. Nakshian, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981), held that a plaintiff was not entitled to a jury trial in a suit against the government under the Age Discrimination in Employment Act (ADEA). Although the ADEA explicitly provided for jury trials in claims against private employers, it was silent regarding jury trials of claims against the United States. See id. at 162-63, 101 S.Ct. 2698. And Fed.R.Civ.P. 38(a) did not provide for a jury trial absent a constitutional or statutory right to one. See id. at 164-65, 101 S.Ct. 2698. The Court observed that “[w]hen Congress has waived the sovereign immunity of the United States, it has almost always conditioned that waiver upon a plaintiffs relinquishing any claim to a jury trial,” id. at 161, 101 S.Ct. 2698, and stated that “[t]he appropriate inquiry, therefore, is whether Congress clearly and unequivocally departed from its usual practice in this area, and granted a right to trial by jury when it amended the ADEA,” id. at 162, 101 S.Ct. 2698. The Court examined the ADEA’s language and history and reached the “inescapable” conclusion “that Congress did not depart from its normal practice of not providing a right to trial by jury when it waived the sovereign immunity of the United States.” Id. at 168-69, 101 S.Ct. 2698. Rather than standing for the broad proposition stated by the SI concurrence, Lehman stands only for the proposition that the Supreme Court will presume that Congress intended to impose traditional conditions on the waiver of sovereign immunity. There is no comparable tradition applicable here; Congress, to our knowledge, has never explicitly conditioned a waiver of sovereign immunity on a prohibition against intervention, as it has conditioned waiver on the absence of jury trial.
In sum, the Rules Enabling Act and the Federal Rules of Civil Procedure require applying Fed.R.Civ.P. 24 in this case unless doing so would expand the jurisdiction of the district court. The only possible expansion would be if intervention infringed on the government’s sovereign immunity. But intervention of a party who seeks no damages or other coercive sanction against the United States does not infringe on its sovereign immunity. Nor does the Quiet Title Act impose any restriction on intervention as a condition to the Act’s waiver of sovereign immunity. The statutory language cannot be read as imposing such a condition, and such a condition would have the anomalous consequence of making the possibility of intervention depend on whether the government or the private claimant first arrived at the courthouse to seek resolution of their dispute. Accordingly, we conclude that sovereign immunity does not impose a jurisdictional bar to SUWA’s intervention.
IV. RULE 24(a) INTERVENTION AS OF RIGHT
Federal Rule of Civil Procedure 24(a) states:
*1188 Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant’s ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties.
We are concerned only with clause (2). A discussion of some of the history of the clause may be instructive.
Clause (2) was promulgated in 1966 to replace former clauses (2) and (3), which stated that the applicant must be permitted to intervene
(2) when the representation of the applicant’s interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof.
39 F.R.D. 69, 109 (1966). The Advisory Committee Notes indicate that at least part of the motivation for the change was to set aside the Supreme Court’s unanimous decision in Sam Fox Publishing Co. v. United States, 366 U.S. 683, 691, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). The Sam Fox decision arose out of a government antitrust proceeding against an unincorporated publishers’ association, ASCAP, which had resulted in a consent decree that the government was attempting to modify. Sam Fox, a member of ASCAP, moved to intervene in the action under Rule 24(a), arguing that the proposed modifications did not go far enough to protect the interests of small publishers who were members of the association and that the representation of the smaller members in the action was inadequate. Construing the word bound in clause (2) narrowly, in its res judicata sense, the Court upheld the district court’s denial of Sam Fox’s motion to intervene. The Court identified a Catch-22 in the clause:
[Ajppellants ... face this dilemma: the judgment in a class action will bind only those members of the class whose interests have been adequately represented by existing parties to the litigation; yet intervention as of right presupposes that an intervenor’s interests are or may not be so represented. Thus appellants’ argument as to a divergence of interests between themselves and ASCAP proves too much, for to the extent that it is valid appellants should not be considered as members of the same class as the present defendants, and therefore are not “bound.” On the other hand, if appellants are bound by ASCAP’s representation of the class, it can only be because that representation has been adequate, precluding any right to intervene.
Id. (citation omitted). The Advisory Committee observed that “[tjhis reasoning might be linguistically justified ... but it could lead to poor results.” Fed.R.Civ.P. 24 advisory committee notes (1966 Amendment).
The 1966 changes to Rule 24(a) were intended to refocus the rule on the practical effect of litigation on a prospective jntervenor rather than legal technicalities, and thereby expand the circumstances in which intervention as of right would be appropriate. In forwarding the proposed amendment for approval by the Standing Committee on Practice and Procedure of the Judicial Conference of the United *1189 States (the Standing Committee), the Advisory Committee explained, “The effect of the amendment [to Rule 24(a) ] is to provide that if a person who would be affected in a practical sense by the disposition of an action is not joined as a party, he has a right to intervene unless he is adequately represented by an existing party.” Comm, on Rules of Practice & Procedure, Report, Ex. B (Statement on Behalf of the Advisory Comm, on Civil Rules to the Chairman & Members of the Standing Committee, June 10, 1965), at 11 (Sept.1965).[7] The new rule’s focus on practical, rather than technical, considerations is further reflected in the statement in the Advisory Committee Notes that “[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.... ” Fed.R.Civ.P. 24 advisory committee notes (1966 Amend-ment).
Moreover, the Rule’s reference to practical consideration in determining whether an applicant can intervene implies that those same considerations can justify limitations on the scope of intervention. If the applicant is granted intervention because of an interest that may be injured by the litigation, it does not follow that the intervention must extend to matters not affecting that interest; and just because no party will adequately represent one particular interest of the applicant does not mean that the applicant must be allowed to participate in the litigation of other matters concerning which its interests are adequately represented. Thus, the Advisory Committee Notes state, “An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the 'requirements of efficient conduct of the proceedings.” Id; see Trbovich, 404 U.S. at 537, 92 S.Ct. 630 (limiting union member’s intervention to “claims of illegality presented by the [Secretary of Labor’s] complaint”); Beauregard, Inc. v. Sword Servs., LLC, 107 F.3d 351, 352-53 (5th Cir.1997) (“[I]t is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right.”). But see 7C Wright et al., supra, § 1922, at 506 (questioning authority of statement in Advisory Committee Notes). In particular, we should mention again that an interve-nor has no power to veto a settlement by other parties. See Local No. 93, 478 U.S. at 528-29, 106 S.Ct. 3063 (“It has never been supposed that one party — whether an original party, a party that was joined later, or an intervenor — could preclude other parties from settling their own disputes and thereby withdrawing from litigation.”); Johnson, 393 F.3d at 1106.
It should go without saying that the 1966 amendments to Rule 24 changed the law. Pre-1966 decisions are no longer binding precedent. Sam Fox, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604, was clearly rejected. And even if Smith v. Gale, 144 U.S. 509, 518, 12 S.Ct. 674, 36 L.Ed. 521 (1892), is a “triple super-duper precedent” because it is 115 years old, Op. (Kelly, J., concurring) at 1208 n. 1 (internal quotation marks omitted), it would be such a precedent with respect to only the matter resolved by that decision — the meaning of a provision of the Code of the Dakota territory in the late nineteenth century. Gale hardly controls our interpretation of current Rule 24.[8] The extent of the change *1190 or, better, the meaning of the current rule is, however, a matter that continues to bedevil the courts.
A. Impaired Interest
We begin by addressing what we will call the impaired-interest requirement for intervention as of right — namely, that “the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant’s ability to protect that interest.” Fed.R.Civ.P. 24(a). We will later turn to the condition that “the applicant’s interest [not be] adequately represented by existing parties.” Id.
The Supreme Court has directly addressed the impaired-interest requirement on only two occasions. Neither opinion is much help. One contains merely a bare holding, with essentially no explanation. The other explains its holding but it is unclear how much it relies on Rule 24.
The first Supreme Court decision on present Rule 24(a)(2) was handed down shortly after the amendment was promulgated. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), involved the attempted intervention of several parties in a Clayton Act proceeding by the government against El Paso Natural Gas Company. An earlier Court decision had held that El Paso’s acquisition of Pacific Northwest Pipeline Corporation had violated the Clayton Act and “order[ed] divestiture without delay.” Id. at 131, 87 S.Ct. 932 (internal quotation marks omitted). The parties then negotiated a divestiture plan. Id. at 132-33, 87 S.Ct. 932. Three nonparties sought to intervene, claiming that their interests would be adversely affected by the plan. Id. at 133-35, 87 S.Ct. 932.
The applications of the first two — the State of California and Southern California Edison, an industrial user of gas who purchased from El Paso sources — were reviewed under the pre-1966 version of Rule 24(a)(3). See id. at 135, 87 S.Ct. 932. Both applicants, according to the Court, had an interest in ensuring a competitive market for gas in California, see id. at 132—33, 87 S.Ct. 932, the interest that the original Court “mandate was designed to protect.” Id. at 135, 87 S.Ct. 932. Addressing the requirement in the former Rule that the two applicants “be adversely affected by a ... disposition of property which is in the custody or subject to the control or disposition of the court,” 39 F.R.D. at 109 (former Rule 24(a)(3)), the Court held that they were “ ‘so situated’ geographically as to be ‘adversely affected’ within the meaning of [the] Rule ... by a merger that reduces the competitive factor in natural gas available to Californians,” Cascade, 386 U.S. at 135, 87 S.Ct. 932.
The third applicant for intervention was Cascade Natural Gas, a retail distributor of gas in Oregon and Washington whose sole supplier, which had been Pacific Northwest, would be the new company created by the divestiture plan. See id. at 133, 87 S.Ct. 932. It claimed that the divestiture plan could impair the ability of its supplier to provide Cascade’s needs in the future. See id. The Court considered Cascade’s application to intervene under the present version of Rule 24(a)(2). It baldly proclaimed: “Since the entire merits of the case must be reopened to give California and Southern California Edison an opportunity to be heard as of right as intervenors, we conclude that the new Rule 24(a)(2) is broad enough to include Cascade also.” Id. at 136, 87 S.Ct. 932.
*1191 Because of the absence of any reasoning supporting the Cascade holding, “[w]ith an occasional rare exception, both the commentators and the lower courts have refused to regard Cascade as significant precedent.” 7C Wright et al, supra, § 1908, at 265. But see id. at 267 (“[Criticism of Cascade on the ground that the Court’s desire to have its mandate carried out caused it to stretch too broadly the concept of ‘interest’ in new Rule 24(a)(2) seems to strike at the wrong target. If Cascade is to be criticized, it ought to be on the ground that the Court misapplied the concept of adequate representation.”). The Court’s opinion was hardly an effort to provide a helpful explanation of a new rule. Indeed, it has been suggested that the Court was largely motivated by a desire to reach the substance of the divestiture plan itself, which some Justices thought did not implement their previous mandate. See id. at 266 (“It is simple historical fact that a majority of the Court in Cascade were of the view that the decree agreed upon by the Attorney General ... did not carry out the Supreme Court’s mandate when the case had last been before it.”); David L. Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv. L.Rev. 721, 729-30, 741-42 (1968).
In contrast, the Supreme Court’s second decision considering Rule 24(a)(2), Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), explains its reasoning, but the extent to which it relied on Rule 24 alone is uncertain. Donaldson concerned a proceeding for judicial enforcement of IRS subpoenas issued to the employer of a taxpayer and the employer’s accountant. See id. at 518-19, 91 S.Ct. 534. The taxpayer sought to intervene. See id. at 521, 91 S.Ct. 534. The Supreme Court affirmed the district court’s denial of intervention. In addressing Rule 24(a)(2) the Court observed that although Fed. R.Civ.P. 81(a)(3) makes the Rules of Civil Procedure applicable to proceedings to enforce agency subpoenas, “the Civil Rules are not inflexible in this application.” Id. at 528, 91 S.Ct. 534. It noted that Rule 81(a)(3) expressly permits a court to issue an order limiting the application of the Rules in such a case. Id. at 528-29, 91 S.Ct. 534. It agreed with lower-court decisions that a Supreme Court footnote stating that the Rules apply in IRS summons proceedings, see United States v. Powell, 379 U.S. 48, 58 n. 18, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), “was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available,” Donaldson, 400 U.S. at 529, 91 S.Ct. 534.
The Donaldson opinion then rejected the taxpayer’s argument that he was entitled to intervene under language in Reisman v. Caplin, 375 U.S. 440, 445, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). The Court said that Reisman had not “pronounce[d], even when confronted with a situation concerning an attorney’s work product, that the taxpayer possesses an absolute right to intervene in an internal revenue summons proceeding. The usual process of balancing opposing equities is called for.” Donaldson, 400 U.S. at 530, 91 S.Ct. 534. Particularly because Reisman never mentioned Rule 24, it is unclear how much of Donaldson’s, discussion of Reisman is meant to construe that Rule and how much is meant to indicate how the applicability of the Rule is limited in agency-summons-enforcement proceedings.
Accordingly, it is appropriate to keep in mind the special context of Donaldson when one reads the language most commonly cited from that opinion in Rule 24(a) cases. That language appeared in the Court’s discussion of the specific circumstances of the taxpayer in that case. The *1192 Court noted that the taxpayer had no proprietary interest and could assert no privilege in the documents sought from his employer and the employer’s accountant. The taxpayer’s “only interest — and of course it looms large in his eyes — lies in the fact that those records presumably contain details of [employer-to-taxpayer] payments possessing significance for federal income tax purposes.” Id. at 530-31, 91 S.Ct. 534. The Court was not impressed by that interest, noting that it was “nothing more than a desire by Donaldson to counter and overcome [the employer’s and its accountant’s] willingness, under summons, to comply and produce records.” Id. at 531, 91 S.Ct. 534. The Court found it significant “that the material in question ... would not be subject to suppression if the Government obtained it by other routine means,” such as voluntary disclosure by the employer or by analysis of deductions included in the employer’s tax returns. Id. Thus,
[t]his interest cannot be the kind contemplated by Rule 24(a)(2) when it speaks in general terms of “an interest relating to the property or transaction which is the subject of the action.” What is obviously meant there is a significantly protectable interest. And the taxpayer, to the extent that he has such a protectable interest, as, for example, by way of privilege, or to the extent he may claim abuse of process, may always assert that interest or that claim in due course at its proper place in any subsequent trial.
We therefore hold that the taxpayer’s interest is not enough and is not of sufficient magnitude for us to conclude that he is to be allowed to intervene.
Id. (citation omitted). The next sentence of the opinion, however, again suggests that the Court’s analysis is limited to agency-summons-enforcement proceedings: “Were we to hold otherwise, as [the taxpayer] would have us do, we would unwar-rantedly cast doubt upon and stultify the Service’s every investigatory move.” Id.
Given the ambiguities of Cascade and Donaldson, it is not surprising that the circuit courts of appeals have struggled to reach a definitive interpretation of Rule 24(a)(2). See 7C Wright et al., supra, § 1908, at 270 (“[A]ny attempt to extrapolate from Cascade or from Donaldson, and to deduce from those cases rules applicable to ordinary private litigation, is fraught with great risks.”). In particular, the notion of “interest” has proved murky. See 6 James Wm. Moore et al., Moore’s Federal Practice § 24.03[2][a], at 24-30 (3d ed. 2006) (“Courts have adopted a variety of approaches and a wide range of terminology in discussing the issue of interest.”). As one treatise has put it,
There is not as yet any clear definition, either from the Supreme Court or from the lower courts, of the nature of the “interest relating to the property or transaction which is the subject of the action” that is required for intervention of right. Indeed, it may well be, as some courts have suggested, that this is a question not worth answering.
7C Wright et al., supra, § 1908, at 263 (quoting Fed.R.Civ.P. 24(a)).
One formulation that has achieved considerable currency, and which the concurring opinions would follow, is that the interest must be “ ‘direct, substantial, and legally protectable.’ ” Utah Ass’n of Counties v. Clinton, 255 F.3d 1246, 1251 (10th Cir.2001) (quoting Coalition of Ariz./N.M. Counties for Stable Econ. Growth v. Department of Interior, 100 F.3d 837, 840 (10th Cir.1996)). We will refer to this formulation as the “DSL” test. The DSL test, or at least its “direct” and “legally protectable” components, is problematic. Whether an interest is direct or indirect *1193 could be a matter of metaphysical debate because almost any causal connection can be represented as a chain of causation in which intermediate steps separate the initial act from the impact on the prospective intervenor. Indeed, early in this circuit’s consideration of Rule 24(a)(2), we wrote, “Strictly to require that the movant in intervention have a direct interest in the outcome of the lawsuit strikes us as being too narrow a construction of Rule 24(a)(2).” Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm’n, 578 F.2d 1341, 1344 (10th Cir.1978).
The term legally protectable interest is perhaps even more malleable. It appears, albeit in slightly different form, in jurisprudence concerning the requirements of Article III standing. The Supreme Court has stated that a plaintiff has such standing only if it has suffered “an invasion of a legally protected interest.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). But as we recently wrote, “The term legally protected interest has generated some confusion” in the standing context. In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir.2006); see Smuck v. Hobson, 408 F.2d 175, 178 (D.C.Cir.1969) (Bazelon, C.J., plurality opinion) (“The effort to extract substance from the conclusory phrase ‘interest’ or ‘legally protectable interest’ is of limited promise.”).
Furthermore, the DSL test misses the point. The central concern in deciding whether intervention is proper is the practical effect of the litigation on the applicant for intervention. Sometimes the DSL test captures that concern. Certainly when no one could dispute that the applicant’s interest is direct, substantial, and legally protectable, intervention is highly likely to be proper (subject, of course, to Rule 24(a)’s other requirements). But the test is not particularly helpful otherwise. And, as we shall see, courts that pay lip servicp to the DSL test regularly manage to manipulate (ignore?) the language to reach the result required by practical considerations. In our view, a court’s analysis is best served by avoiding formulations that only encourage manipulation or wooden logic.
It is worth exploring the provenance of the DSL test. We might feel ourselves obligated to try to apply it if the origin were of sufficient authority. As it turns out, however, the test has a questionable pedigree. It does not come from the Rule itself or a Supreme Court decision interpreting Rule 24(a); recall that Donaldson spoke only of a “significantly protectable interest,” 400 U.S. at 531, 91 S.Ct. 534. Rather, it comes from a district-court opinion whose reasoning was rejected on appeal. The district court had entered a desegregation order against the District of Columbia schools. See Hobson v. Hansen, 269 F.Supp. 401, 517 (D.D.C.1967). When the D.C. Board of Education elected not to appeal the order, the former superintendent of schools and a group of parents of public-school children sought to intervene under Rule 24(a) to challenge the specifics of the order. See Hobson v. Hansen, 44 F.R.D. 18, 20-22 (D.D.C.1968) (Circuit Judge Wright, sitting by designation). The district court declared that the 1966 changes to Rule 24(a) had not “effected a change in the kind of interest required.” Id. at 24. Then, although having noted that “[f]ew [pre-1966] cases have focused on the kind of interest required by Rule 24 ... [because t]ypically, the question of interest was subsumed in the questions of whether the petitioner would be bound or of what was the nature of his property interest,” id. at 22, it stated, “Still required for intervention is a direct, substantial, legally protectable interest in the proceedings,” id. at 24. Struggling to reconcile its *1194 analysis with the year-old decision by the Supreme Court in Cascade, the court wrote, “For though Cascade’s interest in the decree may have been somewhat remote, it did show a strong, direct economic interest, for the new company [created by the consent decree] would be its sole supplier.” Id. at 25. That struggle could be deemed successful only if one accepts a quite loose meaning for direct and legally protectable. This attempt to bring Cascade within the DSL test would have been the first example of a court’s distorting the language of the DSL test to justify a (preordained) result.
Moreover, the result reached by the first holding under the DSL test is questionable. The district court determined that neither the parents nor the former superintendent had shown a sufficient interest to support intervention, id. at 25-29, although it nevertheless granted intervention “in order to give the Court of Appeals an opportunity to pass on the intervention questions raised here, and the questions to be raised by the appeal on the merits if it finds the intervention was properly allowed,” id. at 33. We note that later appellate courts have regularly differed from the district court in Hobson and acknowledged that parents have the interest required by Rule 24(a) to intervene as of right in opposing discrimination suits against school districts. See Morgan v. McDonough, 726 F.2d 11, 12-14 (1st Cir.1984); Johnson v. San Francisco Unified Sch. Dist., 500 F.2d 349, 353 (9th Cir.1974); United States v. Bd. of Sch. Comm’rs, 466 F.2d 573, 574-75 (7th Cir.1972). But see United States v. Franklin Parish Sch. Bd., 47 F.3d 755, 756-57 (5th Cir.1995).
Most striking about the pedigree of the district court’s test in Hobson is that it was rejected on appeal. See Smuck, 408 F.2d 175. The circuit court permitted the parents to intervene, at least to the extent that the district court’s order limited the discretion of the school board. See id. at 178-80. The three dissenters, including future Chief Justice Burger, did not address intervention; but they implicitly accepted intervention because the sole appellants were prospective intervenors and the dissenters would have remanded the case to the district court with instructions to vacate the decree. See id. at 194 (Danaher, J., dissenting). Writing for three of the four members of the majority on this point (the fourth member would have denied intervention), Judge Bazelon interpreted Rule 24(a) differently than the district court. The plurality opinion concluded that the parents had a sufficient interest under Rule 24(a)(2) to attack the district-court decree to the extent that it limited the school board’s discretion. See id. at 178. (The court found that some parts of the decree “d[id] not materially limit the discretion of the School Board.” Id. at 177). The plurality’s analysis of Rule 24(a) has been influential and will be discussed further below. At this juncture it suffices to note that the opinion rejected the district court’s approach, stating that “[t]he effort to extract substance from the conclusory phrase ‘interest’ or ‘legally protectable interest’ is of limited promise.” Id. at 178. Thus, the DSL test did not survive the case in which it was first expressed.
This is not to say that it is error for a court addressing an application for intervention to consider whether the prospective intervenor’s interest is direct, substantial, and legally protectable. As we previously stated, an interest that clearly satisfies all these conditions would likely justify intervention. See 7C Wright, et al., supra, § 1908, at 272 (requirement that an interest be direct, substantial, and legally protectable is best considered a test “of inclusion rather than exclusion. If there is a direct substantial legally protectable in *1195 terest in the proceedings, it is clear that this requirement of [Rule 24(a)(2) ] is satisfied”). But other interests may also suffice. “[T]he interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.” Coalition, 100 F.3d at 841 (internal quotation marks omitted). This view best reflects the purpose of Rule 24(a)(2). As the Advisory Committee Notes to the 1966 Amendment state, “If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.... ” Fed.R.Civ.P. 24, advisory committee notes (1966 Amendment); see Comm, on Rules of Practice and Procedure, Report, Ex. B, supra (“The effect of the amendment [to Rule 24] is to provide that if a person who would be affected in a practical sense by the disposition of an action is not joined as a party, he has a right to intervene unless he is adequately represented by an existing party.”); Mem. from Benjamin Kaplan & Albert M. Sacks (Reporters) to the Advisory Committee on Civil Rules at FF-1, Intervention of Right Rule 24(a) (Apr. 21, 1965) (on file with the Administrative Office of the United States Courts) (same); see also 6 Moore et al., supra, § 24.03[1][c], at 24-26 (“Although each of the requirements [of Rule 24(a)(2) ] involves distinct issues ..., all ... address the same basic question: Will denial of intervention have a significant enough effect on the applicant?”).
As we understand Rule 24(a)(2), the factors mentioned in the Rule are intended to capture the circumstances in which the practical effect on the prospective interve-nor justifies its participation in the litigation. Those factors are not rigid, technical requirements. It is worth recalling that in Donaldson, after rejecting the taxpayer’s contention that he had “an absolute right to intervene in any internal revenue summons proceeding,” the Supreme Court remarked, “The usual process of balancing opposing equities is called for.” Donaldson, 400 U.S. at 530, 91 S.Ct. 534. To be sure, as we have noted, it is unclear how much Donaldson relies on Rule 24(a)(2) and how much it relies on the Court’s authority to limit the application of the Federal Rules in summons proceedings; but the Court certainly seems to be saying that the determination of a party’s right to intervene is, at least in part, a process of equitable balancing.
The leading treatises on the subject appear to share a similar reading of Rule 24(a)(2). One states:
The inquiry required under Rule 24(a)(2) is a flexible one, and a practical analysis of the facts and circumstances of each case is appropriate. Although each of the three criteria is independent, practical application of Rule 24(a)(2) involves a balancing and blending of the independent components. The three criteria are not analyzed in a vacuum and, instead, are often applied as a group.
The criteria should be considered together rather than discretely. Intervention should be granted of right if the interests favoring intervention outweigh those opposed. For example, a lesser showing of impairment may be required by the court if the applicant’s interest is very strong. Likewise, intervention of right may be granted if the applicant’s claimed interest may be significantly impaired by the action, even if some uncertainty exists regarding the sufficiency of that interest. .The inquiry under Rule 24(a)(2) • must focus on the particular facts and procedural posture of each application.
*1196 6 Moore et al., supra, § 24.03[l][b], at 24-25 (footnotes omitted). But see id. § 24.03[2][a], at 24-26 to -27 (appearing to endorse DSL test). The other treatise quotes approvingly from Judge Bazelon’s opinion in Smuck:
“In determining whether ... circumstances [justifying intervention] are present, the first requirement of Rule 24(a)(2), that of an ‘interest’ in the transaction, may be a less useful point of departure than the second and third requirements, that the applicant may be impeded in protecting his interest by the action and that his interest is not adequately represented by others.
This does not imply that the need for an ‘interest’ in the controversy should or can be read out of the rule. But the requirement should be viewed as a prerequisite rather than relied upon as a determinative criterion for intervention. If barriers are needed to limit extension of the right to intervene, the criteria of practical harm to the applicant and the adequacy of representation by others are better suited to the task. If those requirements are met, the nature of his ‘interest’ may play a role in determining the sort of intervention which should be allowed — whether, for example, he should be permitted to contest all issues, and whether he should enjoy all the prerogatives of a party litigant.”
7C Wright et al., supra, § 1908, at 285 (quoting Smuck, 408 F.2d at 179-80); see id. at 288 (describing Judge Bazelon’s opinion as “full and discriminating examination of the rule”).
In light of the pragmatic concerns that gave birth to the 1966 amendment to Rule 24(a), it would be a step backwards to read the Rule’s present language in an overly technical manner. After all, it was the Supreme Court’s pre-1966 decision reading the word bound in the rule in its technical res judicata sense that convinced the rulemakers of the need for new language and new commentary. See Fed. R.Civ.P. 24 advisory committee notes (1966 Amendment) (discussing Sam Fox, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604). “[I]n applying Rule 24(a)(2) courts should ‘not make a fortress of the dictionary’ but rather should ‘apply the rule with thoughtful consideration of the objectives it is intended to serve.’ ” United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 983 (2d Cir.1984) (Friendly, J.) (quoting 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1904, at 474 (1 st ed.1972), now at 7C Wright et al., supra, § 1904, at 239 (2d ed.1986)).
It is worth noting that even those circuits that pay lip service to the DSL test often recognize, explicitly or implicitly, that it must yield to pragmatic concerns. To give a few examples: The Ninth Circuit opinion cited in Judge Kelly’s concurrence (the Rule 24 concurrence) as showing that circuit’s adoption of the DSL test states: “The ‘interest’ test is not a clear-cut or bright-line rule, because no specific legal or equitable interest need be established. Instead, the ‘interest’ test directs courts to make a practical, threshold inquiry, and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.” So. Cal. Edison Co. v. Lynch, 307 F.3d 794, 803 (9th Cir.2002) (citations, brackets, and internal quotation marks omitted). This is the same circuit that has adopted “a virtual per se rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter of the litigation to intervene pursuant to Fed.R.Civ.P. 24(a),” without exerting an effort to explain what the sponsors’ “legally protectable interest” is. Yniguez v. Arizona, 939 F.2d 727, 735 (9th *1197 Cir.1991), vacated sub nom, Arizonans for Official English v. Arizona, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).
In another circuit that the Rule 24 concurrence identifies as having adopted the DSL test, the Seventh, at least two opinions have granted intervention as of right without identifying how the qualifying interest was legally protectable. In Illinois v. Sarbaugh, 552 F.2d 768 (7th Cir.1977), the court permitted corporations that had been indicted (and then pleaded nolo con-tendré) to intervene to oppose the State’s motion for disclosure of grand jury transcripts for a civil suit. Noting that Fed. R.Civ.P. 6(e) at that time said nothing about who could object to disclosure of grand-jury materials, the court said simply: “[T]he intervenors have an interest sufficient to satisfy the requirement of standing and to entitle them to intervene .... Indicted persons now defending a civil action involving the same facts are ... among those who would be adversely affected by disclosure of the information, and therefore should have a right to be heard.” Id. at 773. Later, in Security Insurance Co. of Hartford v. Schipporeit, Inc., 69 F.3d 1377 (7th Cir.1995), the court permitted a church suing an architect to intervene in a suit by the architect’s insurer for a declaratory judgment that it had no obligation to defend or indemnify the architect, whose only significant asset was the insurance policy, see id. at 1380. After reciting the DSL test the court wrote, “Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value.” Id. at 1381. Without bothering to identify the church’s legally pro-tectable interest, it went on:
[The insurer] opposed [the church’s] petition to intervene because it wanted a quick, unopposed adjudication that it had no obligation to defend or indemnify [the architect]. And [the insurer], it seems, was on the verge of obtaining that result. It wanted to play the Washington Generals and get out of town with a quick win. The district court wisely allowed a more worthy opponent to get into and onto the court.
Id. As a practical matter, intervention of the church was clearly proper. The DSL test would hamper, rather than facilitate, the analysis. Why go through the contortions of trying to explain how the church’s interest in whether the architect had insurance coverage was direct (after all, insurance coverage would be irrelevant if the church lost its suit against the architect) or legally protectable?
Similarly, the Eighth Circuit opinion cited in the Rule 24 concurrence as adopting the DSL test also noted that two controlling circuit precedents had held that “an interest in protecting property values was a protectable interest ... [and] an interest in maintaining market values in the proposed intervenors’ homes was sufficient to support intervention.” United States v. Union Elec. Co., 64 F.3d 1152, 1161 (8th Cir.1995) (internal quotation marks omitted). Of particular interest is the court’s description in the second of those precedents of the holding in the first:
In Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861 (8th Cir.1977), for example, a group of homeowners was allowed to intervene in an action involving the constitutionality of a municipal ordinance which placed a temporary moratorium on the operation of abortion clinics. The potential loss in the market value of the intervenors’ homes constituted a sufficient “interest” under Rule 24(a)(2) even though three events would have had to take place before the homeowners experienced any actual loss: (1) the city had *1198 to lose the court fight on the constitutionality of the ordinance, (2) the abortion clinic had to open, and (3) the clinic’s operation had to lead to a reduction in the homeowners’ property values.
SEC v. Flight Transp. Corp., 699 F.2d 943, 948 (8th Cir.1983). We doubt that such an interest would, in common parlance, be considered “direct.”
The Fifth Circuit case cited by the Rule 24 concurrence also illustrates the difficulty posed by trying to apply the DSL test. That court’s recitation of the DSL test was followed by the statement, “Despite these requirements, we have observed that the interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.” Ross v. Marshall, 426 F.3d 745, 757 (5th Cir.2005) (internal quotation marks omitted). It then permitted an insurer to intervene to appeal a judgment against its insured. The court observed that “an insurer has a financial stake in securing a favorable outcome for its insured in a lawsuit alleging potentially covered claims,” id.; and it noted that an insurer may have a contractual right to take over the defense, although it made no mention of such a policy provision in that case, see id. at 757-58. The court also recognized that “some contingency remains in that [the insurer] may still avoid liability if it prevails in its coverage action, [but] we find this contingency insufficient to preclude intervention.” Id. at 759. The court appeared more interested in practical matters than in parsing the terms legally pro-tectable and direct.
As for our own circuit, we need point only to Natural Resources Defense Council, 578 F.2d 1341. We reversed denial of intervention under Rule 24(a)(2) to Kerr-McGee Nuclear Corporation, an operator of a New Mexico uranium mill, and the American Mining Congress, an industry group. The litigation concerned whether a license could be granted to United Nuclear Corporation without prior issuance of a governmental environmental impact statement (EIS). Under regulation by the State of New Mexico, to which the Nuclear Regulatory Commission (NRC) had delegated authority, no statement was required; but absent such delegation, federal law would have required one. The Natural Resources Defense Council sought a declaration either that a statement was required despite the delegation to the state or that the state program violated federal law. The concern of the applicants for intervention was that either an EIS would be required before any future license would be granted for a New Mexico uranium mill or the state’s agreement with the NRC would be ended. We recognized that the pending litigation would have no res judicata effect on the applicants but said that “the court is not limited to consequences of a strictly legal nature.... [T]he stare decisis effect might be sufficient to satisfy the requirement.” Id. at 1345. We failed to identify any interest of the intervenors as being “legally protecta-ble.”
Finally, we note a decision of the District of Columbia Circuit. Although that circuit has not adopted the DSL test, the circumstances addressed in Nuesse v. Camp, 385 F.2d 694 (D.C.Cir.1967), pose a particular challenge to advocates of the test. The court in that case permitted the Wisconsin banking commissioner to intervene in a suit by a Wisconsin bank against the United States Comptroller of the Currency to prevent the opening of a branch of a national bank near the state bank. One wonders what the commissioner’s legally protectable interest was, yet the importance of the commissioner’s intervention is made clear by the opinion.
*1199 In short, Rule 24(a)(2), though speaking of intervention “of right,” is not a mechanical rule. It requires courts to exercise judgment based on the specific circumstances of the case. See Clinton, 255 F.3d at 1251 (noting that application of the interest requirement of Rule 24(a) is “highly fact-specific” (internal quotation marks omitted)). As a result, one must be careful not to paint with too broad a brush in construing Rule 24(a)(2). The applicant must have an interest that could be adversely affected by the litigation. But practical judgment must be applied in determining whether the strength of the interest and the poténtial risk of injury to that interest justify intervention. We cannot produce a rigid formula that will produce the “correct” answer in every case. The law can develop only incrementally, as each opinion, while focusing on the language and purpose of the Rule, addresses the considerations important to resolving the case at hand.
We now turn to SUWA’s application to intervene. No party has suggested that our review is other than de novo, so we apply that standard of review. See City of Stilwell, Okla. v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1042 (10th Cir.1996). But see Maine v. Dir., U.S. Fish & Wildlife Serv., 262 F.3d 13 (1 st Cir.2001) (applying abuse-of-direction review). SUWA’s concern in this case is the potential damage to the environment arising from vehicular traffic in Salt Creek Canyon. It claims that its members “regularly visit Canyonlands National Park' — -and Salt Creek Canyon in particular — for conservation, aesthetic, scientific and recreational purposes.” Aplt. Supp. Br. at 4. It has been a determined advocate for restricting vehicular access to Salt Creek Canyon, engaging in extensive, and successful, litigation to restrict that traffic. See San Juan County, 420 F.3d at 1201-03; S. Utah Wilderness Alliance v. Nat’l Park Serv., 387 F.Supp.2d 1178, 1182-84 (D.Utah 2005). Indeed, it was SUWA’s previous litigation that led to the 1998 closure to vehicular traffic of Salt Creek Canyon above Peekaboo Spring and played some role in the NPS’s June 15, 2004, closure order. See 69 Fed.Reg. at 32,871-72 (adopting closure order and recounting earlier litigation involving SUWA); see also San Juan County, 420 F.3d at 1202.
We think it indisputable that SUWA’s environmental concern is a legally protect-able interest. After all, it was this concern that gave it standing to bring its litigation against the NPS regarding Salt Creek Road. See Lujan, 504 U.S. at 562-63, 112 S.Ct. 2130 (“[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.”); Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (plaintiff would have standing to challenge road development because of impact on scenery and wildlife if it or its members would be significantly affected by the development); Sierra Club v. U.S. Dep’t of Energy, 287 F.3d 1256, 1265-66 (10th Cir.2002) (environmental group has standing to challenge grant of easement).
Moreover, SUWA’s interest is “relat[ed] to the property or transaction which is the subject of the [quiet-title] action” and “the disposition of the action may as a practical matter impair or impede [SUWA’s] ability to protect that interest.” Fed.R.Civ.P. 24(a)(2). As we have already noted, the litigation here proceeds directly from SUWA’s earlier advocacy of its interest. Following our remand in Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 822, 829 (10th Cir.2000), SUWA joined the County and the State as defendants in that litigation so that, as the district court later explained, “the R.S. 2477 issue could be resolved.” Aplt. Add. at 2 (Order, Jan. *1200 15, 2003). After the district court held that it lacked jurisdiction to decide whether the County and the State held a perfected R.S. 2477 right-of way and the NPS permanently prohibited motor vehicles in Salt Creek Canyon above Peekaboo Spring, see 69 Fed.Reg. at 32,871, the County filed this action but did not name SUWA as a defendant. The quiet-title claim may well affect vehicular traffic on the road. In particular, it cannot be doubted that if the County prevails, it will then pursue opening the road to vehicular traffic that SUWA has been trying to prevent. The County’s quiet-title claim alleges that the NPS’s “acts have wrongfully denied [the County] and the public the use of the Salt Creek road.” ApltApp. at 17.
Of course, if the R.S. 2477 claim is rejected, the litigation will not injure SUWA’s interests. But, unlike the Rule 24 concurrence, see Op. (Kelly, J., concurring) at 1208, we think that this possibility is irrelevant. Otherwise, every application to intervene on the side of one of the parties would be rejected on the ground that the aligned party might win (and the applicant’s interest would hence not be injured). The purpose of intervention is to increase the likelihood of that victory.
We also disagree with that concurrence’s apparent view, see id., that SUWA is not entitled to intervene because its interests may not be injured even if the County and the State prevail. The issue is the practical effect of a judgment in favor of the County and the State, not the legally compelled effect. It is enough that the County and the State will pursue opening to vehicular traffic any right-of-way that they obtain. Courts regularly grant applications for intervention on the ground that the result of the litigation could affect which decisionmaker would resolve a matter concerning the applicant, even though it is far from certain that the applicant’s preferred decisionmaker would act more favorably toward the applicant than the alternative decisionmaker. For example, in Natural Resources Defense Council, 578 F.2d 1341, we refused to “suggest that Kerr-McGee could expect better treatment from state authorities than federal,” id. at 1345; yet we reversed.the denial of the company’s application to intervene because we recognized that the litigation could result in changing licensing authority from the state to the federal government. Similarly, in Smuck, 408 F.2d 175, the D.C. Circuit permitted parents of school children to intervene to oppose the portions of a district-court order that limited school-board discretion, even though there was room for doubt that the school board (whose membership was about to change and which was not itself challenging the order, see id. at 177) would exercise its discretion to do anything different from what was ordered. See id. at 180-81; see also Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1, 738 F.2d 82 (8th Cir.1984) (reversing denial of application to intervene by teacher organizations; litigation could result in change of organizations’ bargaining partner from present school districts to a consolidated district).
We recognize that SUWA does not claim that it has title to Salt Creek Road, even though this is a quiet-title suit. But Rule 24(a)(2) does not speak of “an interest in the property”; rather, it requires only that the applicant for intervention “claim[] an interest relating to the property or transaction which is the subject of the action.” Fed.R.Civ.P. 24(a)(2) (emphasis added). The SI concurrence appears to suggest that Rule 24 would not warrant SUWA’s intervention because SUWA could not qualify as a party bringing a quiet-title claim regarding the road. See SI concurrence at 1210-11. An intervenor, however, need not so qualify. Indeed, as the Seventh Circuit has observed, “[T]he strong *1201 est case for intervention is not where the aspirant for intervention could file an independent suit, but where the intervenor-aspirant has no claim against the defendant yet a legally protected interest that could be impaired by the suit.” Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs, 101 F.3d 503, 507 (7th Cir.1996). To add just one example, in Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), the Supreme Court determined that a union member could intervene on the side of the Secretary of Labor in the Secretary’s action to set aside a union election even though the member could bring no claim himself because the governing statute made suit by the Secretary the exclusive post-election remedy.
Thus, we conclude that SUWA’s interest in the environmental impact of Salt Creek Road vehicular traffic satisfies the conditions of Rule 24(a)(2) that it claim “an interest relating to the property or transaction which is the subject of the action and [SUWA] is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest.” This conclusion is strengthened by our practice of considering the public interests at stake when weighing the equities. Our previous decisions under Rule 24(a)(2) have distinguished between cases that implicate solely private rights and cases that raise an issue of public interest. See 6 Moore et al., supra, § 24.03[2][c], at 24-35 (“The Tenth Circuit ... follows a very broad interpretation of the interest requirement with respect to public law issues .... ” (citing Clinton, 255 F.3d at 1251-53, and Coalition, 100 F.3d at 840-44)). If the Supreme Court’s one-sentence holding on present Rule 24(a)(2) in Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 136, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), tells us nothing else, it is that the requirements for intervention may be relaxed in cases raising significant public interests.
We are not persuaded by the Federal Defendants’ effort to minimize SUWA’s interest by pointing to the federal government’s continuing powers concerning the road. They claim that SUWA’s interest in the use of Salt Creek Canyon is “foreign” to this case because “even if title is quieted to San Juan County, the United States still has authority to manage the use of the right-of-way.” Aplee. (Fed.Defs.) Supp. Br. at 20. In support of this assertion, they cite our decision in Southern Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 740 (10th Cir.2005), presumably for the proposition that
when the holder of an R.S. 2477 right of way across federal land proposes to undertake any improvements in the road along its right of way, beyond mere maintenance, it must advise the federal land management agency of that work in advance, affording the agency a fair opportunity to carry out its own duties to determine whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands.
Id. at 748. But our discussion in that case related only to federal authority concerning improvements beyond maintenance of a previously established right-of-way. See id. The retention of some federal control over an R.S. 2477 right-of-way hardly eliminates the impact on SUWA’s interest if the County prevails. The Federal Defendants are not contending, and could not contend, that the volume of traffic on Salt Creek Road will be unaffected by the quiet-title action. That is the whole point *1202 of the suit. See 69 Fed.Reg. at 32,873 (“Should it be ... determined that the State [or the] County do[es] hold a valid R.S. 2477 right-of-way, the [closure of Salt Creek Road to vehicular traffic] will be revisited to ensure that it is consistent with the rights associated with such a right-of-way.”). Furthermore, counsel for the Federal Defendants properly acknowledged at oral argument that even if the NPS retains regulatory authority, a district-court ruling that the County has an easement in Salt Creek Road “may have some impact on what can be regulated.”
The Federal Defendants further suggest that SUWA lacks the requisite interest because even if the County and the State prevail on their R.S. 2477 claims, the United States through the power of eminent domain can “retain the right-of-way by paying just compensation.” Aplee. (Fed.Defs.) Supp. Br. at 21; see 28 U.S.C. § 2409a(b). This argument strikes us as bizarre. Most litigation results could be “reversed” by paying enough. Such a possibility would bar almost all interventions if the Federal Defendants’ argument is correct. The argument would make sense only if the United States had bound itself to retain the right-of-way should it lose the litigation.
The Appellees also rely on our decision in Ozarks, 79 F.3d 1038, to contend that SUWA has only a “contingent” interest in the litigation and that such an interest fails to satisfy Rule 24(a)(2). In that case the City of Stilwell sought to condemn certain distribution facilities owned by Ozarks Rural Electric Cooperative Corporation. Id. at 1040. KAMO, a nonprofit rural generation and transmission cooperative, sought to intervene as a matter of right. KAMO supplied electric power at wholesale rates to the 17 member distribution cooperatives, including Ozarks, that owned it. KAMO claimed that it had “a property interest in the subject of the litigation by virtue of its financial ties to Ozarks,” and that because of those financial ties, an unfavorable result in the lawsuit could lead to increased costs to KAMO’s other consumers. See id. at 1042. KAMO’s sales of power to Ozarks represented roughly 4.4% of its total sales, or 8% of its Oklahoma revenue, id., and the property subject to annexation by Stilwell accounted for 9.32% of Ozarks’ sales revenue in the state, id. at 1041. We said that KAMO “merely ha[d] a contingent interest in the subject of the lawsuit,” and held that this interest was “too attenuated” to “satisfy the ‘direct and substantial’ requirement of Rule 24(a)(2).” Id. at 1042.
The decision in Ozarks seems correct— given the minimal impact the condemnation could have on KAMO’s revenues (9.32% of 8% of its Oklahoma revenue), particular in light of Ozarks’ adequate representation of KAMO’s interest, see id. at 1042-43 — but we do not read it to say that every contingent interest fails to satisfy Rule 24(a)(2). After all, the Supreme Court permitted intervention by Cascade, whose interest in the litigation was that it would get a new supplier for its gas which might not be able to meet its needs. See Cascade, 386 U.S. at 133, 136. KAMO’s problem was that its interest was too contingent, too indirect, and hardly substantial: it would suffer injury only if an adverse decision (leading to the condemnation of the distribution facilities) would reduce the revenues KAMO received from Ozarks so much as to create substantial increased costs to KAMO’s other customers. See Ozarks, 79 F.3d at 1042. The likelihood of such a result was simply too speculative. There is nothing speculative about the impact on SUWA’s interests if the County prevails in its quiet-title action.
*1203 As we said some time ago, “Strictly to require that the movant in intervention have a direct interest in the outcome of the lawsuit strikes us as being too narrow a construction of Rule 24(a)(2).” Natural Res. Def. Council, 578 F.2d at 1344. We agree with the Eighth Circuit: “Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation.” Union Elec. Co., 64 F.3d at 1162.
Before addressing whether SUWA should be denied intervention because its interests are adequately represented by the Federal Defendants, we note that our discussion thus far is consistent with our precedents denying intervention on which the Appellees rely. In Allard v. Frizzell, 536 F.2d 1332 (10th Cir.1976) (per curiam), we affirmed the denial of an application to intervene as of right by environmental groups seeking to enter an action challenging the constitutionality of the Migratory Bird Act and Eagle Protection Act insofar as it restricted possession of certain feathered artifacts. Id. at 1333; id. at 1334 n. 1 (Holloway, J., concurring in the result). We explained that the applicants could not demonstrate that they had an interest that would be “impeded by the disposition of th[e] action.” See id. at 1334 (per curiam). We have said nothing here that would require a contrary result.
Likewise, in Alameda Water & Sanitation District v. Browner, 9 F.3d 88, 90 (10th Cir.1993), we affirmed the denial of intervention as of right to environmental groups seeking to intervene to provide the district court the benefit of its views regarding “nonstructural alternatives” to the construction of a dam. But consideration of those alternatives would not have been proper in the district-court proceeding, which was restricted to the administrative record. See id. at 91. We reasoned that “[t]he opportunity to offer extraneous evidence” beyond the issues before the court was not a protectable interest, and that therefore the interest requirement of Rule 24(a)(2) was not satisfied. See id. ■ Nothing we have said would contravene the holding that Rule 24(a)(2) does not require intervention as of right for the purpose of presenting only irrelevant argument or evidence.
B. Adequate Representation
We now address whether SUWA’s interest is adequately represented in this litigation by the Federal Defendants. Even if an applicant satisfies the other requirements of Rule 24(a)(2), it is not entitled to intervene if its “interest is adequately represented by existing parties.” Fed. R.Civ.P. 24(a)(2).
SUWA claims that “[t]he lack of congruity between [its] focused conservation interests and the government’s broader considerations have been evident throughout SUWA’s decade-long battle to eliminate vehicle use in Salt Creek.” Aplt. Supp. Br. at 21. The Appellees respond that this litigation does not require the government to choose between competing interests; rather, the Federal Defendants’ interest in the case is “simply defending the government’s] title.” Aplee. (Fed.Defs.) Supp. Br. at 26; see Aplee. (County) Supp. Br. at 21.
We are persuaded that the Appel-lees have the better of the argument. SUWA correctly asserts that much precedent states that a prospective intervenor need make only a minimal showing to establish that its interests are not adequately represented by existing parties. But those decisions involve contentions that the government, when it has multiple interests to pursue, will not adequately pursue the par *1204 ticular interest of the applicant for intervention.
The leading such case is Trbovich, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686. The Secretary of Labor was seeking to set aside the election of officers of a union. When a union member sought to intervene, the Secretary objected on the ground that he would adequately represent the member’s interest. The Court disagreed. It observed that under the applicable federal statute the Secretary of Labor had duties both to protect the rights of individual union members against their union and to serve the “vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member.” Id. at 539, 92 S.Ct. 630 (internal quotation marks omitted). “Even if the Secretary is performing his duties, broadly conceived, as well as can be expected,” wrote the Court, “the union member may have a valid complaint about the performance of ‘his lawyer.’ ” Id. In a footnote the Court added: “The requirement of [Rule 24(a)(2) ] is satisfied if the applicant shows that the representation of his interest ‘may be’ inadequate; and the burden of making that showing should be treated as minimal.” Id. at 538 n. 10, 92 S.Ct. 630.
We have repeatedly adopted this reasoning. In National Farm Lines v. Interstate Commerce Commission, 564 F.2d 381, 382 (10th Cir.1977), the plaintiff challenged the constitutionality of a section of the Interstate Commerce Act and subordinate regulations. Several representatives of common carriers operating under certificates issued by the Interstate Commerce Commission sought to intervene to defend the statutory scheme. We held that representation by the Interstate Commerce Commission of the applicant’s interests was inadequate because “the governmental agency [was] seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention.” Id. at 384.
We did so again in Clinton, 255 F.3d at 1248, a suit challenging the validity of a presidential proclamation establishing a national monument. Environmental organizations sought to intervene. We disagreed with the district court’s view that the “ ‘case [was] not about the environment, ... not about the intervenors’ property rights or interests in the monument in question .... [but] about the legality of the president’s actions in creating the monument.’ ” Id. at 1252. We explained that “the government is obligated to consider a broader spectrum of views, many of which may conflict with the particular interest of the would-be intervenor.” Id. at 1256. The environmental organizations, we concluded, had “met the minimal burden of showing that their interests may not be adequately represented by the existing parties.” Id.
This precedent does not apply, however, when interests are aligned. We have stated the general presumption that “representation is adequate ‘when the objective of the applicant for intervention is identical to that of one of the parties.’ ” Ozarks, 79 F.3d at 1042 (quoting Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872 (10th Cir.1986)); see id. (“While [the applicant’s] ultimate motivation in this suit may differ from that of [the original party], its objective is identical — to prevent [the city’s] condemnation.”).
This presumption should apply when the government is a party pursuing a single objective. In Hooker, 749 F.2d 968, the United States filed an action against a chemicals-and-plastics corporation and related business organizations for disposal of chemical waste allegedly in violation of federal law. Environmental groups sought to intervene. The Second Circuit, per *1205 Judge Friendly, upheld the district court’s denial of intervention on the ground that the groups had failed to show inadequate representation of their interests by governments that were already parties (the United States, the State of New York, and the City of Niagara Falls, New York, representing the interests of some groups; and the Province of Ontario representing the interests of others). The court discussed at length the reasons why in that type of suit the representation by the governments should be considered adequate. Much of that reasoning appears to be inapplicable here; but one of the court’s observations is particularly apt. The court rejected the argument that the Supreme Court’s decision in Trbovich, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686, always imposed only a minimal burden of showing inadequate representation by the government. See Hooker, 749 F.2d at 985-87. In Trbovich, noted the court, “the Secretary [of Labor had] a duty to serve two distinct interests — the individual Union member’s interest in the election’s outcome and the general public’s interest in free and democratic union elections.” Id. at 986 (internal quotation marks omitted). The case before the Second Circuit was different. “Appellants have not pointed to anything like the conflicting statutory obligations imposed on the Secretary in Trbo-vich to challenge this claim and thus to justify requiring only a ‘minimal’ burden to show possible inadequate representation.” Id. at 987.
The Seventh Circuit has spoken to the same effect, although perhaps more emphatically. In Solid Waste Agency, 101 F.3d 503, a multicity joint venture brought an action against the Army Corps of Engineers after the Corps denied its permit for a proposed landfill. The village in which the landfill was to be located and a citizens group sought to intervene on the side of the Corps. See id. at 504. The appeals court rejected the prospective intervenors’ arguments, reasoning that “[wjhere the interests of the original party and of the intervenor are identical — where in other words there is no conflict of interest— adequacy of representation is presumed.” See id. at 508. It noted that the interests of the Corps and the prospective interve-nors in the case were “the same: to defeat [the joint venture’s] effort to invalidate the denial of the permit.” Id. The court acknowledged that the Corps’ lawyer, the Department of Justice, possessed “additional interests stemming from its unique status as lawyer for the entire federal government.” Id. But it reasoned that this alone could not be enough to defeat the presumption of adequate representation, because “then in no case brought or defended by the Department could intervention be refused on the ground that the Department’s representation of the would-be intervenor’s interest was adequate.” Id.
Perhaps closest in point is the First Circuit’s opinion in Maine v. Director, U.S. Fish & Wildlife Service, 262 F.3d 13 (1st Cir.2001). The State of Maine and several business groups challenged the designation by the Fish and Wildlife Service and the National Marine Fisheries Service (collectively, the Services) of the Atlantic Salmon in part of Maine as an endangered species. See id. at 14. Several conservation groups sought to intervene on the side of the Services, contending that because they had previously engaged in litigation with the Services over protection of the salmon, the Services could not adequately represent their interests. See id. In rejecting the prospective intervenors’ application, the appeals court employed an “assumption, subject to evidence to the contrary, that the government will adequately defend its actions, at least where its interests appear to be aligned with those of the proposed *1206 intervenor.” Id. at 19. As in Hooker, the court observed that the case involved “no statutorily imposed conflict” that would undermine the Services’ ability to defend the endangered-species designation and the interests of the conservation groups. Id. Rather, the Services and the conservation groups shared a “general alignment of interest ... in upholding the designation.” Id. at 18. As for the prior litigation between the Services and the conservation groups, “[a]n earlier adverse relationship with the government does not automatically make for a present adverse relationship,” id. at 20, especially because the Services had ultimately designated the salmon as endangered “of their own accord,” id. at 21.
Turning to the present case, the issue before us is whether the Federal Defendants will adequately represent SUWA’s interests in the quiet-title action. Although the County’s second cause of action (for declaratory relief) appears to go beyond the issue of title, the district court, when denying intervention, stated that “the pleadings define the case in a very narrow fashion ... the existence or nonexistence of a right-of-way and its length and its breadth,” Aplt.App. at 198; and the Appellees have likewise defined the scope of the case in their defense of the district court’s ruling. We therefore do not address the propriety of intervention with respect to any additional issues that may be raised by the claim for declaratory relief. We hold that on the record before us, SUWA will be adequately represented by the Federal Defendants with respect to the quiet-title claim.
We recognize that SUWA and the NPS have had their differences over the years regarding Salt Creek Road. But when SUWA filed its application to intervene, the Federal Defendants had only a single litigation objective — namely, defending exclusive title to the road — and SUWA could have had no other objective regarding the quiet-title claim. Because SUWA’s objective is identical to the Federal Defendant’s sole objective, we presume adequate representation of SUWA’s interest by the Federal Defendants. This is not like the situation we found in Coalition, 100 F.3d at 845, in which the federal agency was defending a position that it had reluctantly adopted only as a result of litigation by the prospective intervenor. The Federal Defendants have displayed no reluctance, at least so far as the record before us shows, to claim full title to Salt Creek Road. SUWA has provided no basis to predict that the Federal Defendants will fail to present pertinent evidence uncovered by SUWA or an argument on the merits that SUWA would make. Cf. Maine, 262 F.3d at 18-20 (affirming denial of intervention even though prospective intervenors would present an argument that the government was highly unlikely to make; argument could be presented by them in capacity of amicus curiae in district court). Contrary to the dissent, Op. (Ebel, J., dissenting) at 1230-31, we are not inclined to infer from the Federal Defendants’ opposition to intervention that they will fail to vigorously resist the claim to an RS 2477 right-of-way. Indeed, we think that their assertion that they will adequately represent SUWA’s interests in this case is entitled to respect. One of the arts of litigation is keeping matters as simple as possible. We have been instructed from childhood that too many cooks spoil the broth. To oppose another cook in the kitchen is not to oppose the other cook’s desire for a superb meal.
Although the Federal Defendants may not wish to exercise their authority as holder of title in the same way that SUWA would wish, the district court did not treat such exercise of authority as being at issue in this litigation when SUWA’s application *1207 for intervention was rejected. SUWA has given us no reason to believe that the Federal Defendants have any interest in relinquishing to the County any part of the federal title to the road. They may wish to compromise with the County concerning use of the road, but nothing has indicated that they would do so by transferring an easement and the authority that goes with it. And so long as the United States retains title, SUWA can continue with its pursuit of requiring the NPS to conform to federal environmental laws. This litigation, however, did not implicate those laws when the district court denied intervention.
We hold that SUWA did not overcome the presumption that the Federal Defendants would adequately represent its interest. The district court properly denied SUWA’s application to intervene as of right.
We note, however, that this denial does not forever foreclose SUWA from intervention. If developments after the original application for intervention undermine the presumption that the Federal Defendants will adequately represent SUWA’s interest, the matter may be revisited. See Maine, 262 F.3d at 21-22; Solid Waste Agency, 101 F.3d at 508-09.
V. RULE 24(b) PERMISSIVE INTERVENTION
The district court in this case also denied SUWA’s application to intervene permissively under Fed.R.Civ.P. 24(b). The panel opinion did not address permissive intervention because it held that intervention as of right was required. See San Juan County, 420 F.3d at 1213-14.
In its opening supplemental brief on en banc review, SUWA addresses permissive intervention only in an abbreviated footnote. See Aplt. Supp. Br. at 2 n. 1 (“SUWA also warrants permissive intervention in this case. To permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation. Accordingly, even if SUWA does not meet the ‘legally protecta-ble interest test, permissive intervention should be granted.’ ” (citation and internal quotation marks omitted)). We question whether this is sufficient to require us to address the issue. See Norris, a Dover Res. Co. v. NLRB, 417 F.3d 1161, 1168 (10th Cir.2005) (issue mentioned but not argued in footnote not adequately briefed); Utahns for Better Transp. v. U.S. Dep’t of Transp., 305 F.3d 1152, 1169 (10th Cir.2002) (argument consisting entirely of con-clusory statements and unhelpful citations deemed waived for failure to brief). In any event, the district court’s denial of permissive intervention was not an abuse of discretion. See Ozarks, 79 F.3d at 1043 (reviewing denial of permissive intervention under abuse-of-discretion standard).
VI. CONCLUSION
We VACATE the panel decision and AFFIRM the district court’s denial of SUWA’s application to intervene. We GRANT Attorney Eric Biber’s Motion for Withdrawal.

. On en banc review we have also received amicus briefs from a group of civil-procedure and public-lands law professors (supporting intervention); a group of environmental organizations (supporting intervention); Property Owners for Sensible Roads Policy (supporting intervention); the States of Utah and Wyoming (opposing intervention); the Mountain States Legal Foundation (opposing intervention); and the States of New Mexico, California, and Oklahoma (neither supporting nor opposing intervention). The State of Utah, although participating on appeal only as an amicus, was granted leave to intervene by the district court after this appeal was filed. It asserts a property interest in Salt Creek Road.

. SUWA’s intervention in the quiet-title suit hardly makes the lawsuit a "forumd for consideration of broad-ranging arguments about competing environmental and recreational uses of the land.” SI concurrence at 1215. This appeal concerns only intervention in the title dispute.

. There remains the possibility, of course, that even if no "substantive right" is at stake, the waiver of sovereign immunity may be conditioned on a procedural rule that should be treated as a jurisdictional matter. See *1180 Henderson, 517 U.S. at 672-73, 116 S.Ct. 1638 (Scalia, J., concurring).

. Similarly, we doubt that § 1367 would override state sovereign immunity, as recognized in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In that case the plaintiffs alleged that state and local officials had violated federal and state law in the care of mentally disabled persons. The Supreme Court implicitly assumed that the federal courts had jurisdiction over the federal-law claims. The issue was whether there was also pendent jurisdiction over the state-law claims. The Court first held that sovereign immunity under the Eleventh Amendment precludes a federal court from adjudicating "a claim that state officials violated state law in carrying out their official responsibilities.” Id. at 121, 104 S.Ct. 900. It then ruled that Eleventh Amendment immunity was not defeated just because the barred claim would, absent the Eleventh Amendment, be within federal jurisdiction as a claim pendent to proper claims filed under federal statutes. See id. In other words, pendent-jurisdiction doctrine could not override the state sovereign immunity recognized by the Eleventh Amendment. The critical fact was that the claim added under pendent jurisdiction was a new claim against the state which exposed the state to the risk of coercive sanctions. "If we were to hold otherwise,” said the Court, "a federal court could award damages against a State on the basis of a pendent claim.” Id. at 120, 104 S.Ct. 900.
Perhaps we should note that Pennhurst did not suggest that merely adding a party, without adding a new claim against the sovereign, infringed upon sovereign immunity. Consider a case in which the plaintiff (1) had a proper claim against a state for which the Eleventh Amendment had been overridden (either by the State’s consent or by Congressional enactment, see, e.g., Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (family-leave provisions of Family and Medical Leave Act abrogate Eleventh Amendment immunity)), and (2) wished to join a claim against a private defendant. We are not aware of cases holding that Eleventh Amendment sovereign immunity would bar such joinder. In any event, Pennhurst does not address intervention and says nothing whatsoever about restrictions, if any, imposed by sovereign immunity when the sovereign faces no new claim.

. We have no doubt that § 1367(a) applies to claims under the Quiet Title Act. To be sure, under § 1367(a) a statute may "expressly” exclude joinder. But the term expressly must be narrowly construed. It is not enough that the statute clearly provides for only limited jurisdiction. After all, in Finley the Court thought that the FTCA unambiguously "define[d] jurisdiction in a manner that does not reach defendants other than the United States.” 490 U.S. at 553, 109 S.Ct. 2003. Yet all agree that § 1367 abrogates Finley. See Allapattah, 545 U.S. at 558, 125 S.Ct. 2611. The difference in the language of the FTCA and the Quiet Title Act can hardly justify their being treated differently under § 1367. The FTCA states that "district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States.” 28 U.S.C. § 1346(b)(1). The Quiet Title Act states that the "United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.” Id. § 2409a. Neither "expressly provide[s]” that § 1367(a) does not apply.

. This is an additional argument against the sovereign-immunity contention in this case. We are in no way implying that intervention on the side of the plaintiff in this case would be barred by sovereign immunity; that issue is hot before us.

. Available at http://www.uscourts.gov/rules/ Reports/ST09-1965-1. pdf.

. It may be of some interest that the only citations to Gale in the Wright & Miller treatise are as contrary authority to the treatise's view of the proper spelling of intervenor. See, *1190 e.g., 1C Wright et al., supra, § 1902, at 231 n. 3.